# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

United States of America, *ex rel.* Troy Olhausen,

     Plaintiff,

v.

Arriva Medical, LLC, Alere, Inc., and Abbott Laboratories, Inc.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:19-cv-20190-RNS

Honorable Robert N. Scola, Jr.

## DEFENDANTS' MOTION TO DISMISS RELATOR'S THIRD AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................... 2

I.    RELEVANT ALLEGATIONS ................................................................................... 2

II.   PROCEDURAL HISTORY ........................................................................................ 3

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT ................................................................................................................... 4

I.    FCA STATUTORY BARS REQUIRE DISMISSAL OF COUNTS I, III AND
      V ................................................................................................................................ 4

      A.    The First-to-File Bar Requires Dismissal as a Matter of Law ................................ 4

      B.    The Government-Action Bar Requires Dismissal with Prejudice ......................... 8

      C.    The Public-Disclosure Bar Also Precludes the Ancillary-Products Claim .......... 10

II.   THE REMAINING COUNTS (AND OTHERS) LACK PARTICULARITY .......... 11

III.  NONE OF THE ALLEGED REGULATORY VIOLATIONS CREATES
      FCA LIABILITY. ................................................................................................... 13

      A.    Invalid Prescriptions – Count I ........................................................................ 14

      B.    Assignments of Benefits – Count II ................................................................. 15

      C.    Unnecessary Devices – Count III .................................................................... 16

      D.    Undisclosed Locations – Count IV .................................................................. 17

      E.    Unsolicited Contacts – Count V ...................................................................... 18

IV.   OLHAUSEN DOES NOT ALLEGE ANY ACTIONABLE CONSPIRACY ........... 19

V.    ALL CLAIMS AGAINST ABBOTT LACK PARTICULARITY. .......................... 20

CONCLUSION .............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. United Life Ins. Co. v. Martinez*,
    480 F.3d 1043 (11th Cir. 2007) ............................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................4

*Carrel v. AIDS Healthcare Found.*,
    898 F.3d 1267 (11th Cir. 2018) .............................................1, 11, 12

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984).........................................................................19

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) ...............................................2, 11, 12, 19

*D'Agostino v. ev3, Inc.*,
    845 F.3d 1 (1st Cir. 2016) ............................................... *passim*

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010).........................................................................10

*Grider v. City of Auburn*,
    618 F.3d 1240 (11th Cir. 2010) ....................................................19

*Grynberg v. Koch Gateway Pipeline Co.*,
    390 F.3d 1276 (10th Cir. 2004) .......................................................7

*Hixson v. Health Mgmt. Sys., Inc.*,
    613 F.3d 1186 (8th Cir. 2010) .............................................16, 17, 18

*In re Allied Home Med., Inc.*,
    2010 WL 2831001 (H.H.S. Feb. 8, 2010)........................................14

*In re Managed Care Litig.*,
    150 F. Supp. 2d 1330 (S.D. Fla. 2001) ..........................................19

*Kellogg Brown & Root Servs., v. U.S. ex rel. Carter*,
    135 S. Ct. 1970 (2015).......................................................................5

*Leon v. Cont'l AG*,
    301 F. Supp. 3d 1203 (S.D. Fla. 2017) ...........................................20

*Makro Capital of Am., Inc. v. UBS AG,*
   436 F. Supp. 2d 1342 (S.D. Fla. 2006) ...................................................................................3

*Makro Capital of Am., Inc. v. UBS AG,*
   543 F.3d 1254 (11th Cir. 2008) .................................................................................5, 8, 9

*Polansky v. Exec. Health Res.,*
   2019 WL 5790061 (E.D. Pa. Nov. 5, 2019) ..................................................................14, 19

*S.E.C. v. Solow,*
   2007 WL 917269 (S.D. Fla. Mar. 23, 2007) ...........................................................................11

*Safeco Ins. Co. of Am. v. Burr,*
   551 U.S. 47 (2007)......................................................................................................... *passim*

*State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby,*
   137 S. Ct. 436 (2016) ................................................................................................................9

*U.S. ex rel. Atkins v. McInteer,*
   470 F.3d 1350 (11th Cir. 2006) ..........................................................................................11, 12

*U.S. ex rel. Bennett v. Biotronik, Inc.,*
   876 F.3d 1011 (9th Cir. 2017) ...............................................................................................9, 10

*U.S. ex rel. Bernier v. Infilaw Corp.,*
   347 F. Supp. 3d 1075 (M.D. Fla. 2018).............................................................................5, 6, 8

*U.S. ex rel. Clausen v. Lab. Corp.,*
   290 F.3d 1301 (11th Cir. 2002) ....................................................................................1, 4, 11, 12

*U.S. ex rel. Eisenstein v. City of New York,*
   556 U.S. 928 (2009)..................................................................................................................9

*U.S. ex rel. Heath v. AT&T,*
   791 F.3d 112 (D.C. Cir. 2015) ...............................................................................................5, 6

*U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs.,*
   149 F.3d 227 (3d Cir. 1998)..................................................................................................6, 7, 8

*U.S. ex rel. LaFauci v. AbbVie Inc.,*
   2019 WL 1450791 (D.N.J. Apr. 2, 2019) .................................................................................7

*U.S. ex rel. Lujan v. Hughes Aircraft Co.,*
   243 F.3d 1181 (9th Cir. 2001) ...................................................................................................5

*U.S. ex rel. Lupo v. Quality Assurance Servs.,*
   242 F. Supp. 3d 1020 (S.D. Cal. 2017).....................................................................................19

*U.S. ex rel. Osheroff v. Humana Inc.*,
   776 F.3d 805 (11th Cir. 2015) .......................................................................................10

*U.S. ex rel. Patel v. Catholic Health Initiatives*,
   792 F. App'x 296 (5th Cir. 2019) ........................................................................16, 18, 19

*U.S. ex rel. Petratos v. Genentech Inc.*,
   855 F.3d 481 (3d Cir. 2017).........................................................................13, 14, 15, 16

*U.S. ex rel. Phalp v. Lincare Holdings, Inc.*,
   857 F.3d 1148 (11th Cir. 2017) ............................................................................ *passim*

*U.S. ex rel. Potra v. Jacobson Cos.*,
   2014 WL 1275501 (N.D. Ga. Mar. 27, 2014).................................................................19

*U.S. ex rel. Purcell v. MWI Corp.*,
   807 F.3d 281 (D.C. Cir. 2015) .................................................................................2, 13

*U.S. ex rel. Sanchez v. Lymphatx, Inc.*,
   596 F.3d 1300 (11th Cir. 2010) .....................................................................................11

*U.S. ex rel. Sanders v. E. Ala. Health. Auth.*,
   953 F. Supp. 1404 (M.D. Ala. 1996) .............................................................................20

*U.S. ex rel. Springfield Terminal Ry. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ..........................................................................................9

*U.S. ex rel. Streck v. Allergan, Inc.*,
   746 F. App'x 101 (3d Cir. 2018) ...................................................................................13

*United States v. Unisys Corp.*,
   178 F. Supp. 3d 358 (E.D. Va. 2016) ..........................................................................5, 8

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
   136 S. Ct. 1989 (2016).......................................................................................... *passim*

*Viridis Corp. v. TCA Global Credit Master Fund, LP*,
   155 F. Supp. 3d 1344 (S.D. Fla. 2015) .........................................................................20

**Statutes**

42 U.S.C. §1395m(a)(17)......................................................................................................8, 19

False Claims Act, 31 U.S.C. §3729 *et seq.* ..................................................................1, 5, 8, 9, 10

**Other Authorities**

42 C.F.R. §400.202 .....................................................................................................................15

42 C.F.R. §410.38 ...................................................................................................14

42 C.F.R. §414.210 .................................................................................................16

42 C.F.R. §414.412 .................................................................................................17

42 C.F.R. §414.422 .................................................................................................16

42 C.F.R. §424.36 ...................................................................................................15

42 C.F.R. §424.55 ...................................................................................................15

42 C.F.R. §424.57 ..............................................................................................17, 18

75 Fed. Reg. 52629-01, 52635 (Aug. 27, 2010) .................................................17, 18

Medicare Program Integrity Manual §5.2.7 ............................................................14

Relator Troy Olhausen alleges that Arriva Medical, a mail-order supplier of diabetes testing supplies, violated federal rules when marketing its products and filling orders. He claims those purported regulatory violations meant that Medicare claims Arriva submitted were "false" under the False Claims Act (FCA). Olhausen also tacks on a claim that Arriva conspired to violate the FCA with its parent companies, Alere and Abbott.

Olhausen brought these same claims in his Second Amended Complaint. After the government declined to intervene, Defendants promptly moved to dismiss based on numerous legal defects: Olhausen failed to identify a single false claim; he did not adequately plead any element of the FCA; and another relator had already alleged (and the government investigated and declined to pursue) many of these regulatory issues in a related, earlier-filed case.

Recognizing his pleading deficiencies, Olhausen sought leave to amend in lieu of responding. His new Third Amended Complaint (TAC) tinkers on the margins but does not fix the fundamental flaws in his FCA theories. (ECF No. 58.) Olhausen's complaints about perceived regulatory missteps simply cannot create liability under the FCA, a statute targeted only to recovering "damage to the public fisc." *U.S. ex rel. Clausen v. Lab. Corp.*, 290 F.3d 1301, 1311 (11th Cir. 2002). Nothing in his complaint states a viable claim, and the Court should dismiss it with prejudice for the same reasons his prior complaint failed.

***First***, the FCA forecloses Olhausen's claims related to invalid prescriptions (Count I), medically unnecessary products (Count III), and unsolicited sales calls (Count V). Five years before Olhausen filed suit, another former Arriva employee named Greg Goodman brought a *qui tam* FCA suit based on those same allegations. That requires dismissal of Olhausen's copycat claims under the FCA's first-to-file bar. *See* 31 U.S.C. §3730(b)(5). Furthermore, the government has since intervened in *Goodman*, triggering the FCA's related government-action bar. That provision permanently precludes any FCA suit based on allegations in *Goodman* at the time the government intervened. 31 U.S.C. §3730(e)(3). Independently, Olhausen now admits he bases his allegations in Count III on information from a government audit, triggering yet another statutory barrier: the public-disclosure bar. 31 U.S.C. §3730(e)(4)(a)(ii). Counts I, III and V must be dismissed for these reasons alone.

***Second***, the Court should dismiss Olhausen's claims because they lack the particularity Rule 9(b) requires. To satisfy Rule 9(b), a relator must allege "that a *specific fraudulent claim* was in fact submitted to the government." *Carrel v. AIDS Healthcare Found.*, 898 F.3d 1267, 1275

(11th Cir. 2018). Defendants' last motion to dismiss put Olhausen on notice of this fundamental flaw, yet he has not even tried to address it for most counts—including Counts II and IV, the only theories not subject to statutory bars—and still falls short for the others. He still fails to allege the "who, what, when, where, and how" of an actual false submission to the government, requiring dismissal, now with prejudice. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

*Third*, even beyond these threshold failures, each count still fails to plausibly allege the FCA's essential elements for several independent reasons: (1) the alleged regulatory missteps do not violate the rules he cites and cannot create *false* claims; (2) the complaint does not allege *materiality* because it lacks well-pleaded facts showing that the "garden-variety … regulatory violations" would have changed government payment decisions, *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016); and (3) to allege *scienter* under the FCA's rigorous "objective knowledge standard," a relator must show that the applicable statutes and regulations clearly prohibited the defendant's conduct under every reasonable interpretation or, at minimum, the conduct was contrary to "authoritative" governmental guidance, *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 284, 290 (D.C. Cir. 2015), a standard Olhausen cannot meet under *any* reasonable interpretation of the law.

*Finally*, Olhausen's attempts to bring claims against Arriva's parents, Abbott and Alere, fail for additional reasons. The conspiracy claim is a non-starter because companies within the same corporate structure cannot conspire as a matter of law, and separately Olhausen does not allege any agreement or overt act with specificity. Nor does the complaint tie Abbott to any particular false claim, as Rule 9(b) demands.

Olhausen has already had a chance to try to fix all these deficiencies, but his additional allegations do not—and cannot—help. The Court should now dismiss this case with prejudice.

## BACKGROUND

## I.   RELEVANT ALLEGATIONS

Arriva sold mail-order diabetic testing supplies (DTS) and related "ancillary products" like heating pads and orthotic braces. TAC ¶44. Alere purchased Arriva in 2011. *Id*. ¶46. Arriva's business grew in subsequent years as it acquired other mail-order DTS companies, but it lost its Medicare billing number in November 2016. *Id*. ¶¶50, 54, 68. Abbott bought Alere, including Arriva, in 2017, and closed Arriva soon after. *Id*. ¶¶77, 79.

Olhausen alleges Arriva violated a number of Medicare rules when it furnished supplies to its patients.  He surmises that these supposed violations rendered false some number of ensuing Medicare claims.  Specifically, he alleges:

- **Invalid Prescriptions (Count I).**  Arriva provided DTS to patients whose prescriptions on file were allegedly invalid either because they supposedly had lapsed under state law, or because the patients had changed doctors.  *Id*. ¶¶91-99, 102, 104.

- **Assignments of Benefits (Count II).**  Arriva allegedly sent supplies without collecting signed forms from patients that Olhausen says Medicare rules required.  *Id*. ¶¶111-51.

- **Medically Unnecessary Devices (Count III).**  Arriva allegedly shipped DTS and ancillary products without ensuring patients actually needed them or that were unnecessary under Medicare rules.  *Id*. ¶¶152-218.  Relatedly, Olhausen claims Arriva instructed sales representatives to tell patients they could switch to a new brand of glucose meter despite a rule that forbids suppliers from pressuring patients to change brands.  *Id*. ¶¶219-57.

- **Undisclosed Locations (Count IV).**  When Arriva applied for and executed its 2013 and 2016 Medicare contracts, it allegedly did not disclose locations in Tennessee, Arizona, Kentucky, and the Philippines that supposedly required independent accreditation and supplier numbers.  *Id*. ¶¶258-355.

- **Unsolicited Contacts (Count V).**  After Arriva purchased another mail-order company, it allegedly called its newly acquired patients, with whom it had no prior contacts, to sell them supplies.  *Id*. ¶¶356-63.  Olhausen alleges these calls violated a statute prohibiting calls to Medicare beneficiaries under certain circumstances.

- **Conspiracy (Count VI).**  Arriva allegedly conspired with its parent companies, Alere (which acquired Arriva in 2011) and Abbott (which acquired Alere in 2017), to submit false Medicare claims based on the regulatory violations alleged in Counts I-V.  *Id*. ¶440.

## II.    PROCEDURAL HISTORY

This case begins not with Olhausen, but a different former Arriva employee, Greg Goodman.  In August 2013, Goodman filed an FCA complaint in the Middle District of Tennessee, which he amended in March 2014.  (Ex. A.)[1]  Goodman's complaint included many of the same allegations Olhausen included in his case five years later.  Specifically, Goodman alleged:

- **Invalid Prescriptions.**  Arriva "billed Medicare for diabetic supplies without having the necessary prescriptions on file."  ¶¶17, 82, 168-79; *compare* TAC ¶¶89-110.

- **Unnecessary Medical Devices.** Arriva shipped devices to patients that were medically unnecessary under Medicare rules because the patients' prior equipment was less than five

---

[1]    The Court may take judicial notice of the *Goodman* docket when resolving a motion to dismiss.  *See, e.g.*, *Makro Capital of Am., Inc. v. UBS AG*, 436 F. Supp. 2d 1342, 1350 (S.D. Fla. 2006).

years old; billed Medicare for other medically unnecessary supplies; and violated the "anti-switching" requirement by inducing customers to use Arriva's preferred brands of glucose meters.  ¶¶13, 78, 86-130, 236-37; *compare* TAC ¶¶152-218.

- **Unsolicited Contacts.**  Arriva instructed sales representatives to cold-call Medicare beneficiaries to try to sell them supplies, including "upselling" ancillary products like heating pads and braces.  ¶¶16, 81, 154-67; *compare* TAC ¶¶167-70, 356-63.

The government investigated Goodman's allegations for five years.  Then, on January 14, 2019, Olhausen brought this *qui tam* action.  The next month, on February 8, 2019, the government elected to intervene in part in *Goodman*, and the court unsealed Goodman's complaints.

The government filed its complaint-in-intervention in *Goodman* on May 14, 2019, which pursued some but not all of Goodman's allegations.  As relevant here, it included Goodman's allegation that Arriva supposedly sold beneficiaries medically unnecessary meters.  U.S. Am. Compl. ¶¶124-37, 166 (Ex. B).  The government then agreed to dismiss Goodman's remaining claims, including his allegations concerning invalid prescriptions, unsolicited telephone contacts, unnecessary products other than meters, and the anti-switching requirement.  (Exs. C & D.)

Olhausen filed a second amended complaint on October 24, 2019.  The government declined to intervene in this suit on November 5, 2019, and this Court unsealed the complaint. Olhausen served Defendants in late January 2020, and Defendants promptly moved to dismiss. Olhausen did not respond, but instead sought leave to amend for a third time specifically "to address alleged deficiencies raised by Defendants[] in their Motion to Dismiss."  (ECF No. 53.)

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint's factual allegations must support "a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id*. FCA claims must also meet Rule 9(b)'s heightened pleading standard, "stat[ing] with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *Clausen*, 290 F.3d at 1309.

**ARGUMENT**

**I.    FCA STATUTORY BARS REQUIRE DISMISSAL OF COUNTS I, III AND V.**

**A.    The First-to-File Bar Requires Dismissal as a Matter of Law**

The Court should dismiss Counts I, III and V under the FCA's first-to-file bar because Goodman was already pursuing an FCA suit based on the same allegations when Olhausen filed his initial complaint.  "When a person brings an action under [the FCA], no person other than the

4

Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. §3730(b)(5). Under this "first-to-file" bar, only the original FCA action may proceed; all other actions concerning the alleged conduct must be dismissed.

Crucially, a later case need not rely on identical facts to run afoul of the first-to-file bar. The claims are "related" if they "incorporate the same material elements of fraud as the earlier action, even if the allegations incorporate additional or somewhat different facts or information." *U.S. ex rel. Bernier v. Infilaw Corp.*, 347 F. Supp. 3d 1075, 1083 (M.D. Fla. 2018) (quoting *U.S. ex rel. Heath v. AT&T*, 791 F.3d 112, 121 (D.C. Cir. 2015)). "[T]he whole point of the first-to-file bar is to see 'whether the later [filed] complaint alleges a fraudulent scheme the government already would be equipped to investigate based on [the first] [c]omplaint.'" *Id.* Duplicative suits serve no enforcement purpose because the first claim already alerted the government to the alleged fraud. *See Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1260 (11th Cir. 2008). Thus, when "the first-filed claim provides the government notice of the essential facts of an alleged fraud, … the first-to-file bar stops repetitive claims." *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001) (explaining the first-to-file bar is "exception-free").

These principles require dismissal here. When Goodman sued Arriva in 2013, he triggered the first-to-file bar and prevented anyone besides the United States from filing an action based on the same allegations. *Kellogg Brown & Root Servs., v. U.S. ex rel. Carter*, 135 S. Ct. 1970, 1978 (2015). Olhausen filed his suit in January 2019, raising several of the same legal claims as Goodman while Goodman's *qui tam* complaint was still pending.

**Invalid Prescriptions.** Count I alleges Arriva violated the FCA by seeking reimbursement for supplies it shipped to patients "without obtaining new, valid prescriptions." TAC ¶89; *see id.* ¶367. Goodman made the same allegation—that Arriva "illegally billed Medicare for diabetic supplies without having the necessary prescriptions on file from beneficiaries' physicians"— triggering the first-to-file bar. *Goodman* Compl. ¶17; *see id.* ¶¶168-79. The only superficial difference between the two complaints is that they identify different laws that supposedly rendered Arriva's prescriptions invalid. *Compare id.* ¶171, *with* TAC ¶¶95, 102, 366. But the first-to-file bar precludes FCA suits "based on the *facts* underlying the pending action," so Olhausen cannot rescue his claim by identifying new *legal* authority. 31 U.S.C. §3730(b)(5) (emphasis added); *see United States v. Unisys Corp.*, 178 F. Supp. 3d 358, 369 (E.D. Va. 2016) ("[A] focus on the theory of fraud is inconsistent with the statutory language … which expressly focuses on 'the facts.'").

The essential facts alleged in Olhausen's complaint are the same as in *Goodman*: Arriva allegedly presented claims for payment knowing "the claims were supported by invalid prescriptions." TAC ¶366. That requires dismissal of Count I under the first-to-file bar.

**Unnecessary Products.** Count III alleges Arriva shipped three types of unnecessary products: glucose meters, testing supplies, and ancillary products. Count III also alleges Arriva violated the so-called "anti-switching" requirement. *Goodman* bars all of it.

*First*, Olhausen claims Arriva provided patients with unnecessary glucose meters, and violated the "anti-switching" rule, when it sent patients new glucose meters from one of its preferred brands. TAC ¶¶385, 391. Count III also alleges Arriva shipped new glucose meters (and other items) automatically after a certain period, "without ensuring the beneficiary needed the item." *Id.* ¶390. Goodman made the same allegation—that Arriva submitted reimbursement claims for glucose monitors "knowing the glucose monitors to be medically unnecessary … due to the fact that the beneficiaries did not request them." *Goodman* Compl. ¶236. And Olhausen's anti-switching claim directly restates Goodman's allegation too. *See id.* ¶¶86-130, 259-66. Olhausen adds nothing to Goodman's allegations regarding unnecessary glucose meters, much less any new "material elements of fraud." *Bernier*, 347 F. Supp. 3d at 1083.

*Second*, Olhausen alleges Arriva shipped patients DTS—strips, lancets, control solution, and batteries—without ensuring the patient needed them. TAC ¶¶156-60, 392. Goodman made exactly the same allegation about strips. *Goodman* Compl. ¶237 ("Defendants … submitted false claims for payment for medically unnecessary testing strips."). To be sure, Olhausen provides a little more detail about Arriva's alleged failure to document testing frequency, and tries to expand the alleged fraud to more products. TAC ¶¶157-59, 194-202. As a matter of law, however, neither adding "additional … facts" elaborating on Goodman's allegation that Arriva provided patients with more supplies than they needed, nor expanding Goodman's allegations to other products, changes the result. *Bernier*, 347 F. Supp. 3d at 1083; *Heath*, 791 F.3d at 121.

The Third Circuit's *LaCorte* decision confirms Olhausen cannot salvage his later-filed testing-strip claim. There, the first relator had generally alleged that the defendant billed the federal government for blood tests that no doctor had requested, and a second relator alleged more precisely that the defendant's employees had held phony "screening programs" at nursing homes where they took and analyzed blood and urine samples without informing the patients' physicians. *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs.*, 149 F.3d 227, 236 (3d Cir. 1998). The

Third Circuit nonetheless found the second relator's claim barred because it "merely echoe[d] the [first] parties' broader allegation that [the defendant] billed the United States for unrequested blood tests." *Id.*; *accord Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1280 (10th Cir. 2004) ("[Relator] has not managed to avoid §3730(b)(5)'s first-to-file bar simply by alleging additional facts relating to *how* Koch mismeasured the natural gas, even though some of those specific allegations were not mentioned in the [prior] complaint."). Olhausen's allegations, which add far less detail than those in *LaCorte*, are likewise subsumed by Goodman's broader allegations that Arriva billed Medicare for "medically unnecessary testing strips." *Goodman* Compl. ¶237.

Nor does it make a difference that Goodman did not expressly allege Arriva submitted claims for unnecessary lancets, control solution, and batteries, in addition to testing strips. When one relator alleges a company engaged in a fraudulent scheme involving a particular product line, a second relator cannot avoid the first-to-file bar simply by alleging that the same scheme encompassed another, closely related product line. *See, e.g.*, *U.S. ex rel. LaFauci v. AbbVie Inc.*, 2019 WL 1450791, at *4 (D.N.J. Apr. 2, 2019) (dismissing under first-to-file bar because allegations regarding additional drugs "involve similar wrongdoing [as alleged in the first complaint], just in different business lines"). In fact, here the allegations do not even involve a *different* business line, but other products customers necessarily use along with strips to test glucose levels. By alleging Arriva shipped excessive quantities of testing strips, Goodman plainly gave the government "enough information to discover [the] related fraud" of billing for excessive quantities of the other testing supplies used in conjunction with strips. *LaCorte*, 149 F.3d at 234. Indeed, the government could hardly have failed to uncover any excessive shipments of additional testing supplies given that, as Olhausen himself alleges, Arriva prepackaged and shipped those products in the same boxes as the allegedly unnecessary testing strips. TAC ¶¶157-59.

*Third*, Olhausen alleges Arriva billed Medicare for unnecessary diabetes-related products like heating pads and orthotic braces. Olhausen again cannot avoid the first-to-file bar simply by extending Goodman's allegations regarding unnecessary meters and testing strips to "different business lines"—particularly closely related ones like these. *See LaFauci*, 2019 WL 1450791, at *4. That is particularly true here, where the *Goodman* complaint specifically detailed Arriva's alleged scheme to "up-sell" *the very same* "heating pads, back braces, and impotence therapy devices *to every patient they spoke to*," supposedly rendering these claims false. *Goodman* Compl. ¶¶154-55 (emphasis added). Goodman even included the call scripts that sales representatives

used when trying to sell these ancillary products to patients, which emphasized that Medicare would cover 80% of the cost.  *Id.* ¶¶157-60.  These unambiguous allegations that Arriva both (1) improperly tried to "upsell" ancillary products, and (2) shipped medically unnecessary DTS, "were sufficient to tip off the federal government that other aspects of [Arriva's operations] may also have been infected with fraud"—namely that some of the patients did not really need the products they ordered.  *Unisys Corp.*, 178 F. Supp. 3d at 370-71; *see also LaCorte*, 149 F.3d at 234.  Goodman's medical necessity and upselling allegations put the government on notice of Arriva allegedly shipping medically unnecessary supplies and "equipped [the government] to investigate" false claims submitted for ancillary products.  *Bernier*, 347 F. Supp. 3d at 1083. Nothing more is required to trigger the first-to-file bar.

**Unsolicited Telephone Calls.**  Count V alleges Arriva contacted patients it acquired when it purchased certain Liberty Medical assets from Express Scripts.  TAC ¶¶54-55, 356-63.  Olhausen claims these contacts violated 42 U.S.C. §1395m(a)(17), which prohibits certain types of unsolicited marketing.  *Id*.  Goodman alleged the same conduct, and even relied on the same statutory provision.  *Goodman* Compl. ¶¶16, 81, 154-67.

In short, Counts, I, III and V rest on the same core allegations as the earlier *Goodman* complaint. They therefore must be dismissed under the first-to-file bar.

**B.      The Government-Action Bar Requires Dismissal with Prejudice**

While a first-to-file dismissal would typically be without prejudice, the government has since intervened in *Goodman*, imposing an insurmountable barrier to refiling: the government-action bar.  In February 2019, after Olhausen filed suit, the government intervened in part in *Goodman*, electing not to proceed with several of the overlapping theories from Goodman's complaint.  Far from curing Olhausen's problems, however, the government's intervention in *Goodman* forever bars his claims, even if he tries to file a new action.

Under the government-action bar, "[i]n no event may a person bring an action under [the FCA] which is based upon allegations or transactions which are the subject of a civil suit … in which the Government is already a party."  31 U.S.C. §3730(e)(3).  Like the first-to-file bar, the government-action bar follows from the principle that the government, not the relator, is the real party-in-interest in an FCA suit; once the government steps in to prosecute an alleged fraud, there is no longer any need for relators.  *See Makro Capital*, 543 F.3d at 1260.

The government-action bar also "represents deference to a governmental decision not to sue for a particular case of fraud." *Id*. If the government has enough evidence of an alleged fraud to investigate, yet concludes it is not worth pursuing, there is no reason to let a relator pursue that very claim in the government's name. Thus, the government-action bar precludes *all claims* in the suit when the government became a party—*i.e.*, when it exercises its right to intervene, *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 931 (2009)—even if some are subsequently dismissed. *U.S. ex rel. Bennett v. Biotronik, Inc.*, 876 F.3d 1011, 1020 (9th Cir. 2017); *see also U.S. ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994) (explaining core purpose of bar is "rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own").

The Ninth Circuit recently addressed this very fact pattern in *Bennett*. There the government had intervened in an earlier relator's suit, settling some claims and dismissing others. 876 F.3d at 1019-20. Bennett later tried to bring similar claims, arguing the government-action bar should not apply because the statute speaks in the present tense: it bars claims based on allegations that "*are* the subject of a civil suit … in which the Government *is* already a party." 31 U.S.C. §3730(e)(3) (emphases added). The Ninth Circuit disagreed, holding the bar precluded *all* of the claims, including those the government dismissed from the earlier action: "The Government becomes a party to the suit as a whole when it intervenes. It does not become a 'party' to a particular claim or number of claims." *Bennett*, 876 F.3d at 1021 ("A person's status as a party does not hinge on the outcome of each of the claims of the lawsuit to which he becomes a party.").

That reading is also the only one that harmonizes the statute as a whole. Notably, Congress specified that the related first-to-file bar applies only to "a related action based on the facts underlying the *pending* action." 31 U.S.C. §3730(b)(5) (emphasis added). In the government-action bar, by contrast, Congress did *not* use the qualifier "pending," instead broadly prohibiting any suit "based upon allegations … which are the subject of a civil suit … in which the Government is already a party." 31 U.S.C. §3730(e)(3). Under bedrock principles of statutory construction, "Congress's use of explicit language in one provision cautions against inferring the same limitation in another." *State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 137 S. Ct. 436, 443 (2016).

Here, the government investigated, and was obviously capable of prosecuting, Goodman's allegations about invalid prescriptions, unnecessary supplies, the anti-switching requirement, and unsolicited calls, but decided not to pursue them when it intervened in the suit. Under the

government-action bar, Olhausen cannot assert any claim on behalf of the government based on allegations that were part of Goodman's complaint at the time of intervention—including Counts I, III and V—after the government itself declined to pursue them. *Bennett*, 876 F.3d at 1020.

### C.     The Public-Disclosure Bar Also Precludes the Ancillary-Products Claim

Olhausen's allegations that Arriva supplied medically unnecessary ancillary products also run headlong into the public-disclosure bar. That statutory bar mandates that courts "shall dismiss" FCA claims "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," unless the relator "is an original source of the information. 31 U.S.C. §3730(e)(4)(A); *see Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 295 (2010) (bar strikes a balance between "stifling parasitic lawsuits" based on information known to the government and "encouraging private persons to root out fraud"). Among other ways, the bar is triggered when the same alleged fraud was disclosed in a "Federal … audit." 31 U.S.C. §3730(e)(4)(A)(ii). To qualify as an "original source," a relator must either have, "prior to the public disclosure … voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or allege "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. §3730(e)(4)(B).

Here, in an effort to meet his Rule 9(b) obligation to identify specific claims submitted to the government (discussed below in Part II), Olhausen added allegations to Count III about a few specific Medicare claims for allegedly unnecessary ancillary products. But by Olhausen's own admission, these claims were disclosed in a *federal audit*, which analyzed the claims, supposedly determined they were not medically necessary, and then notified Arriva that Medicare had reimbursed Arriva for unnecessary braces and heating pads. TAC ¶¶179-87. Thus, on the face of the complaint, the "transactions" on which Olhausen bases the ancillary-products portion of Count III were disclosed in one of the "sources that are considered to be public," and the public-disclosure bar requires dismissal. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015).

Olhausen cannot avoid the bar by claiming to be an "original source" of this information. He does not (and cannot) allege he "voluntarily disclosed" the relevant information to the government "prior to" the audit. 31 U.S.C. §3730(e)(4)(B). And his allegations do not "materially add" to the public disclosures. The audit was "already sufficient to give rise to an inference"— indeed, it directly asserted—that Arriva submitted reimbursement claims for unnecessary ancillary products. *Osheroff*, 776 F.3d at 815. Olhausen could not "materially add" to it. *See id.*

## II.      THE REMAINING COUNTS (AND OTHERS) LACK PARTICULARITY.

Virtually all of Olhausen's claims—including Counts II and IV, the only ones that survive the statutory bars—fail to allege the presentment of an actual Medicare submission, as required to state a claim.  "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello*, 428 F.3d at 1012; *id.* at 1014.  Thus, as the Eleventh Circuit has repeatedly held, a relator must allege "a *specific fraudulent claim was in fact submitted*." *Carrel*, 898 F.3d at 1275 (insider's mere "accusation of underlying improper practices alone is insufficient").[2]  "Without the *presentment* of [a false] claim … there is simply no actionable damage to the public fisc as required under the False Claims Act." *Clausen*, 290 F.3d at 1311.  This particularity requirement applies to each discrete theory of liability.  *S.E.C. v. Solow*, 2007 WL 917269, at *3 (S.D. Fla. Mar. 23, 2007) (facts "must be tied directly to each individual count"); *see also Carrel*, 898 F.3d at 1277 (relator may not use "particular allegations about [failed] claims" to advance his other theories).

Defendants identified this dispositive defect in their motion to dismiss the Second Amended Complaint, which never mentioned a single claim.  Now Olhausen does little more, only linking Defendants' alleged conduct to actual Medicare claims for a sliver of a single count: the ancillary-products theory in Count III (which relies exclusively on public disclosures, so just trades one problem for another).  Nowhere else does the complaint link any allegations of misconduct to any actual payment claim "submitt[ed] … to the government." *Corsello*, 428 F.3d at 1012.  That requires dismissal of the remainder of the complaint under settled law.

**<u>Invalid Prescriptions.</u>**  Count I fails for lack of particularity because Olhausen still has not alleged that "*actual false claims* for payment [were made] to the government" in cases where prescriptions lapsed or patients changed doctors. *Carrel*, 898 F.3d at 1277.  Although this part of the complaint now purports to reference a few examples, *none* involves the allegedly improper conduct: Arriva requesting payment based on outdated prescriptions.  TAC ¶¶106-10.  To the contrary, Olhausen's attempts to allege specific claims on their face involve circumstances where there *was* a prescription, and Arriva simply sent too many supplies, or Arriva supposedly lacked a

---

[2]      *Accord Corsello*, 428 F.3d at 1012-13; *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010); *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359-60 (11th Cir. 2006).

record of any prescription. *See id.* Equally important, this count purports to rely on state laws, but nothing ties these allegations to any state that ostensibly requires frequent renewals. The so-called example claims have no connection to Olhausen's actual theories.

**Assignments of Benefits.** Count II does not even try to link the supposed failure to obtain patient assignments to "any actual claims or any actual charges." *Clausen*, 290 F.3d at 1313. Olhausen merely cites general statistics about internal audits and Arriva's billing practices, TAC ¶¶133-36, but "mathematical probability" is not enough. *Carrel*, 898 F.3d at 1277. The Eleventh Circuit has expressly rejected Olhausen's approach of trying to show that Arriva "surely must have submitted a false claim at some point." *Id.* Indeed, in *Carrel* the relators even pointed to a "spreadsheet [listing] various patients, employees, [and] test dates"—far more than Olhausen offers here—but the court still found these details inadequate "[a]bsent more exact allegations that [the organization's actions] *converged into actual false claims.*" *Id.* at 1277-78 (emphasis added).

**Unnecessary Medical Products.** Olhausen cites a few instances where Medicare contractors denied claims for ancillary products such as braces and heating pads, TAC ¶¶178-80, 185-86, but ***none*** involve the glucose meters or testing supplies at the heart of Count III. *Carrel*, 898 F.3d at 1277 (relator may not use "particular allegations about [failed] claims" to advance his other theories); *see also Corsello*, 428 F.3d at 1012 (actual submission "is the *sine qua non* of [an FCA] violation"). Instead, Olhausen again resorts to "mathematical probability," speculating that statistical sampling would have uncovered improper claims. TAC ¶190. That falls well short of what the Eleventh Circuit requires. *Carrel*, 898 F.3d at 1277; *accord U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1354, 1359 & n.5 (11th Cir. 2006) (affirming dismissal where relator identified "particular patients, dates, and corresponding medical records for services" because complaint lacked allegations about any "*actually submitted* reimbursement claim").

**Undisclosed Locations and Unsolicited Contacts.** In Counts IV and V, Olhausen has not even tried to cure the defects in his last complaint. He still does not point to any actual "submission of a fraudulent claim to the government," and that requires dismissal. *Corsello*, 428 F.3d at 1012-13 (a "pattern of improper practices" still requires the actual "submission of a fraudulent claim"); *see also Clausen*, 290 F.3d at 1312-13 (rejecting complaint backed by "dozens of pages of exhibits," including "patient lists" and "patients' lab results," absent a "link" to actual claims).

III.   **NONE OF THE ALLEGED REGULATORY VIOLATIONS CREATES FCA LIABILITY.**

The statutory bars and Olhausen's failure to identify specific claims doom his entire complaint.  Independently, though, each of Olhausen's scattershot FCA theories also does not adequately allege the elements of an FCA claim:

**Falsity.**  Taking Olhausen's allegations as true, Arriva's conduct still does not violate the rules he cites.  Rather, he simply misconstrues the applicable legal requirements.

**Scienter.**  Olhausen cannot allege Defendants acted with the necessary scienter.  To violate the FCA, a person must "knowingly present[] … a false or fraudulent claim" to the government. *Escobar*, 136 S. Ct. at 1996 (scienter requirement is "rigorous").  Courts assess FCA scienter under an "objective knowledge standard." *Purcell*, 807 F.3d at 284, 290.  Where "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 & n.20 (2007); *Purcell*, 807 F.3d at 287-288 ("[T]he FCA does not reach … claims made based on reasonable but erroneous interpretations of a defendant's legal obligations.").  Instead, the Court must dismiss unless the relator adequately alleges the defendant had the benefit of a contrary "authoritative interpretation" from "the courts of appeals or the [relevant agency] that might have warned it away from the view it took." *Safeco*, 551 U.S. at 70 & nn. 19-20; *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017); *U.S. ex rel. Streck v. Allergan, Inc.*, 746 F. App'x 101, 105-10 (3d Cir. 2018) (affirming dismissal where defendants' interpretation was objectively reasonable and relator did not plead they were warned away from it).

**Materiality.**  Olhausen does not allege that the supposed regulatory violations were "material to the Government's payment decision." *Escobar*, 136 S. Ct. at 1996.  "The materiality standard is demanding" to ensure the FCA does not become an all-purpose tool for enforcing "garden-variety … regulatory violations" and is properly cabined to violations that actually impact government payment decisions. *Id.* at 2002-03.  Accordingly, the Court must dismiss at the pleading stage if "there are no factual allegations showing that [the government] would not have reimbursed the[] claims" had it been fully aware of the defendant's alleged conduct. *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 489-90 (3d Cir. 2017); *Escobar*, 136 S. Ct. at 2004 n.6 (relator must affirmatively "plead[] facts to support allegations of materiality").  Key factors

include whether the government has in fact "denied reimbursement" after learning of the allegations. *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 7 (1st Cir. 2016).

## A.    Invalid Prescriptions – Count I

The complaint alleges two supposed problems with patients' prescriptions: that certain prescriptions had lapsed under state laws requiring periodic renewal, and that patients needed new prescriptions when they switched doctors. TAC ¶¶91, 367. Both theories fail.

*First*, Olhausen fails to show a legal violation to allege falsity. The regulation he cites for his changing-doctors theory in no way says that switching doctors invalidates an existing prescription. *Id.* ¶102 (citing 42 C.F.R. §410.38(d)). And the state laws he cites are codes and regulations that govern "pharmacists" and "pharmacies"—not durable medical equipment suppliers like Arriva. *Id.* ¶95. Shotgun legal citations do not establish an FCA violation.

*Second*, Olhausen cannot establish scienter. Not only was Arriva's understanding of the applicable prescription rules objectively reasonable, it was *correct* as a matter of law. Olhausen certainly does not cite any clear rule saying that laws applicable to pharmacies and drugs also cover medical equipment suppliers. Nor does he allege Arriva's conduct was contrary to any "authoritative" guidance. *Safeco*, 551 U.S. at 69-70 & nn.19-20; *Phalp*, 857 F.3d at 1155. Indeed, the only guidance document Olhausen cites—while not even "authoritative" under *Safeco*—actually undermines his position: it enumerates "situations" in which "[a] new order is required," yet does *not* list the age of a prescription or changing doctors. TAC ¶93 n.3; *see* Medicare Program Integrity Manual Ch.5.2.7.

*Third*, Olhausen has not alleged materiality. Count I is devoid of any "factual allegations showing that [Medicare] would not have reimbursed these claims" had it known of his allegations, *Petratos*, 855 F.3d at 489-90, nor does Olhausen offer any basis to infer that the "Government consistently refuses to pay [similar] claims in the mine run of cases," *Escobar*, 136 S. Ct. at 2003. His lone example of adverse government action does not even involve a stale prescription or change in doctor. TAC ¶101 (citing *In re Allied Home Med., Inc.*, 2010 WL 2831001 (H.H.S. Feb. 8, 2010)). Rather, it concerns a "power wheelchair" that the beneficiary did not need—hardly a relevant comparison to Arriva providing diabetes supplies to patients who had diabetes. *Id.*

Were there any doubt Olhausen's allegations are ***not*** material, the government has *twice* declined to pursue them—here and in *Goodman*. *See Polansky v. Exec. Health Res.*, 2019 WL 5790061, at *18 (E.D. Pa. Nov. 5, 2019) ("declining to intervene … [is] probative of the lack of

14

materiality"); *Goodman* Compl. ¶¶17, 82, 171-79, 242.  And Olhausen admits the government *renewed* Arriva's Medicare contract in 2016 with full knowledge of these allegations after Goodman filed his complaint.  TAC ¶219.  That belies any inference of materiality.  *D'Agostino*, 845 F.3d at 7 ("The fact that [the government] has not denied reimbursement … in the wake of [relator's] allegations casts serious doubt on the materiality of the fraudulent representations.").

      **B.**    **Assignments of Benefits – Count II**

      Olhausen's theory that Arriva submitted false claims because it failed to obtain Assignments of Benefits from customers fails for several reasons.  *First*, he has not pled a legal violation.  Arriva had a contract with Medicare, and thus was a "[p]articipating supplier" under Medicare regulations.  42 C.F.R. §400.202; TAC ¶¶51-52, 219.  The regulations clearly state that, "when payment is for services furnished by a *participating physician or supplier*, the beneficiary … *is not required* to assign the claim to the supplier in order for an assignment to be effective." 42 C.F.R. §424.55(c) (emphases added).  Olhausen's jumbled assertions about which products those contracts covered and at what times are beside the point; the regulation applies to the *supplier*, it does not differentiate by *product*.  *E.g.*, TAC ¶¶120-122.  It is enough that Arriva—a participating supplier—provided the service.  Independently, 42 C.F.R. §424.36(c)—a regulation Olhausen cites—validates Arriva's actions.  That rule permits a supplier to "sign [a] claim on the beneficiary's behalf" when the "services … involved no personal contact between the … supplier and the beneficiary."  Arriva operated by mail order, so it did not need to collect patient signatures as a matter of law.

      *Second*, Olhausen has not pled scienter.  Given the exemption for participating suppliers, it is impossible to say Arriva's interpretation of law was "objectively unreasonable."  *Safeco*, 551 U.S. at 69-70 & nn.19-20.  Nor does (or can) Olhausen allege any contrary "authoritative" guidance.  *Phalp*, 857 F.3d at 1155.  Instead, he relies again on his own self-serving, incorrect interpretations of law and Arriva's internal decision not to collect unnecessary documents.  TAC ¶¶123-29.  That is not enough, particularly when the law confirms Arriva's view.

      *Third*, Count II does not plead materiality.  Olhausen does not cite evidence the government has ever refused payment on this basis, let alone "in the mine run of cases."  *Escobar*, 136 S. Ct. at 2003-04; *Petratos*, 855 F.3d at 489.  Olhausen cites a Medicare manual, TAC ¶139, but the Supreme Court has rejected that approach, differentiating between an agency's *statement* that a condition is material and its actual conduct when paying claims.  *Escobar*, 136 S. Ct. at

2003-04 ("A misrepresentation cannot be deemed material merely because the Government designates compliance … a condition of payment."). Olhausen needs facts showing this garden-variety regulatory violation actually impacts Medicare payment decisions, and he has none. *Id.*

### C.    Unnecessary Devices – Count III

Olhausen's unnecessary-device allegations do not state a claim either. *First*, the complaint again fails to establish a legal violation. For example, it says Arriva would ship unspecified items "every five years[] regardless of whether the beneficiary indicated their current device *needed* replacing," TAC ¶162 (emphasis added), but the regulation provides that Medicare will pay for a new meter every five years, 42 C.F.R. §414.210(f). Similarly, Olhausen claims Arriva improperly drove its patients to switch brands, *see* TAC ¶¶219-40, but the complaint does not allege any of the heavy-handed tactics the rule prohibits, *see* 42 C.F.R. §414.422(e)(3) (supplier prohibited from "influencing or incentivizing the beneficiary by *persuading, pressuring, or advising* them to switch" (emphasis added)). The cited call scripts invited *patients* to make the first inquiry, *e.g.* TAC ¶¶222-25, and suppliers may indeed "furnish information about alternative brands" if "the beneficiary requests such information," 42 C.F.R. §414.422(e)(3).

*Second*, the allegations fall well short of establishing that any conduct was "objectively unreasonable" or contrary to an "authoritative" interpretation. *Safeco*, 551 U.S. at 69-70 & nn.19-20; *Phalp*, 857 F.3d at 1155. The text of the cited rules supports Arriva's conduct, and certainly does not clearly prohibit it. Absent a court of appeals opinion or binding agency guidance that should have warned Arriva away from its objectively reasonable interpretation—and Olhausen alleges none—there cannot be FCA liability. *See Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010).

*Finally*, Olhausen's efforts to show materiality are lacking. Beyond the publicly disclosed audits, which are limited to his ancillary-product claim, nothing in the complaint suggests Medicare refused to pay similar claims in the past, much less consistently refused to pay them. *See Petratos*, 855 F.3d at 489. Equally important, the 2013 *Goodman* complaint informed the government of *all* of Olhausen's allegations about supposedly unnecessary devices and alleged anti-switching violations, *see* Part I.A, yet the government elected to *renew* Arriva's contract in 2016. That vitiates any inference of materiality. *See D'Agostino*, 845 F.3d at 7; *U.S. ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019) ("[T]he complaint specifies

that the [defendant] has continued to submit claims and receive reimbursement …. This suggests that the government does not care."); TAC ¶219.

### D. Undisclosed Locations – Count IV

Olhausen cites a tangle of rules in support of his theory that Arriva inadequately disclosed and accredited its Philippines, Arizona, Tennessee, and Kentucky locations. None helps him.

*First*, Olhausen fails to plead any violation. His theory is that the non-Florida locations were subcontractors or separate suppliers, and Arriva needed to disclose them and obtain separate accreditation and supplier numbers. TAC ¶258. Not so. As the complaint elsewhere concedes, these locations were all part of a single business network under common control: the Philippines location "was a subsidiary of Alere" (Arriva's parent), and Arriva "acquired"—*i.e.*, owned—the Arizona, Kentucky, and Tennessee locations. *Id.* ¶¶275, 291-92. These locations were not unaffiliated "subcontractors," but "[c]ommonly-owned or controlled suppliers" entitled to "submit a single bid to furnish a product category" under Medicare rules. 42 C.F.R. §414.412(d)(3). Indeed, the most Olhausen can allege is that Arriva had an "informal business association agreement" with the Philippines location—hardly a hallmark of an arms-length subcontractor arrangement. *Id.* ¶284.

Moreover, in 2010 the Department of Health and Human Services endorsed ancillary locations operating under the same corporate umbrella. In connection with a proposed rule change governing supplier facilities, a commenter requested "clarif[ication] that … suppliers may continue to utilize centralized business centers to house beneficiary and other business records and centralized customer call centers." 75 Fed. Reg. 52629-01, 52635 (Aug. 27, 2010). Far from suggesting these facilities must be in the same physical location as the supplier's main office, the agency confirmed the propriety of "centralized business center[s]." *Id.*

*Second*, Arriva's interpretation was objectively reasonable. For example, Olhausen points to a regulation suggesting that a supplier should enroll and disclose separate physical locations it uses to "furnish" supplies—an undefined term—but it is objectively reasonable to conclude the Philippines site was not "furnish[ing]" supplies because it was not shipping physical goods. 42 C.F.R. §424.57(b)(1); *see Safeco*, 551 U.S. at 69-70 & nn.19-20 (rejecting liability when the statute was "silent" on a key issue); *Hixson*, 613 F.3d at 1190 ("[A] statement that a defendant makes based on a reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute."). So too Arriva's interpretation of the

regulation addressing which locations can "bill Medicare," which does not prohibit off-site locations routing claims through a single headquarters and datacenter, as Olhausen alleges happened here.  42 C.F.R. §424.57(c)(24); TAC ¶¶279-81, 297-98.  And government guidance only confirmed Arriva's interpretation about off-site locations.  75 Fed. Reg. at 52635.  Given this (at worst) ambiguous regulatory landscape, Arriva could not have "act[ed] with the requisite" scienter as a matter of law.  *Hixson*, 613 F.3d at 1190.

*Finally*, Olhausen does not show the use of off-site facilities—at most a "garden-variety … regulatory violation[]"—were material to Medicare payment.  *Escobar*, 136 S. Ct. at 2003.  Far from it.  The government has been aware of these locations since 2013, when Goodman—who worked in the Tennessee location—filed his complaint flagging Arriva's use of non-Florida locations.  *See Goodman* Initial Compl. (Ex. E) ¶¶64, 79 (discussing Tennessee); 67 (alleging Defendants used a call center in the Philippines that performed "new patient intake, reorder, and customer service").  Yet Olhausen cannot allege the government *ever* withheld payment on this basis.  *See Escobar*, 136 S. Ct. at 2004 n.6.  On the contrary, he admits the government decided to *renew* Arriva's contract in 2016 despite these allegations.  TAC ¶219.  That defeats any inference of materiality.  *D'Agostino*, 845 F.3d at 7; *Patel*, 792 F. App'x at 301.

Olhausen has now added allegations to try to overcome this reality, pointing to general reimbursement rules, outdated CMS policy statements, and inapposite agency proceedings—all of which misses the point.  TAC ¶¶302-09.  The question for materiality purposes is whether the government *actually* would have refused to pay *Arriva* had it known of the alleged violations.  *See D'Agostino*, 845 F.3d at 7-8.  Here, Olhausen's complaint, coupled with the *Goodman* proceedings, show that the government was fully aware the non-Florida facilities, yet did nothing—even as it pursued other claims against Arriva originating from a relator from one of these very locations.  Olhausen cannot show materiality where the government continued to pay with full knowledge of the non-Florida locations.

### E.    Unsolicited Contacts – Count V

Olhausen also fails on his claim that Arriva violated the FCA by improperly contacting patients.  **First**, Olhausen has not alleged any violation at all.  According to the complaint, Arriva purchased certain assets from Express Scripts in 2013.  TAC ¶¶54-55.  Olhausen claims Arriva violated Medicare rules when it contacted the customers it acquired as part of that transaction, *id.*

¶¶356-63, but those rules do not require a company that buys another to break off contact with the customers it obtains.  *See* 42 U.S.C. §1395m(a)(17).

*Second*, there is no scienter.  The statute says nothing to suggest a company that acquires another may not reach out to its new customers, and thus Arriva's interpretation was objectively reasonable as a matter of law.  Nor does (or could) Olhausen allege Arriva's reading was at odds with any "authoritative" interpretation.  *Phalp*, 857 F.3d at 1155.

*Third*, Olhausen has not pled materiality.  The *Goodman* complaint made similar allegations about unsolicited calls, yet the government declined to pursue this theory.  *See Goodman* Compl. ¶¶19, 84(b), 267-75; *Polansky*, 2019 WL 5790061, at *18.  Indeed, the government, with full awareness of these alleged violations, *renewed* Arriva's contract in 2016.  This all defeats materiality.  *See D'Agostino*, 845 F.3d at 7; *Patel*, 792 F. App'x at 301.

## IV.  OLHAUSEN DOES NOT ALLEGE ANY ACTIONABLE CONSPIRACY.

Olhausen's failure to state a claim under the FCA likewise forecloses his FCA conspiracy claim.  *E.g.*, *U.S. ex rel. Potra v. Jacobson Cos.*, 2014 WL 1275501, at *4 (N.D. Ga. Mar. 27, 2014) ("Because the Relators have failed to state an FCA claim, their claim that the Defendants allegedly conspired to violate the FCA necessarily fails.").  It also fails for independent reasons.

*First*, Olhausen's theory—that Arriva conspired with its parent companies—fails as a matter of law under the intra-corporate conspiracy doctrine.  "[T]he intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."  *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010); *see U.S. ex rel. Lupo v. Quality Assurance Servs.*, 242 F. Supp. 3d 1020, 1027 (S.D. Cal. 2017) (collecting cases holding doctrine applicable to FCA).  The doctrine applies with equal force to wholly-owned subsidiaries of parent corporations: because "[a] parent and its wholly owned subsidiary have a complete unity of interest," the idea of a conspiratorial agreement between parent and subsidiary "lacks meaning."  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984); *see In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1350 (S.D. Fla. 2001).  Thus, as a matter of law, any purported agreement among the Defendants was not conspiratorial.

*Second*, the conspiracy allegations also fail under Rule 9(b).  An FCA conspiracy claim requires an agreement between the defendant and one or more co-conspirators to violate the FCA, and a complaint must include "specific allegations of [an] agreement or overt act."  *Corsello*, 428

F.3d at 1014 (affirming dismissal of FCA conspiracy claim); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) ("[W]here a conspiracy claim alleges that two or more parties agreed to commit fraud, the plaintiff must also plead this act with specificity.").  Olhausen's bare allegations that Alere and Abbott "directed" Arriva to submit false claims fall well short of the specific allegations of an agreement needed to state a claim.  *See* TAC ¶¶142-148, 210-218, 401; *U.S. ex rel. Sanders v. E. Ala. Health. Auth.*, 953 F. Supp. 1404, 1410 (M.D. Ala. 1996) (dismissing FCA conspiracy because "such a claim must be supported by an allegation of an agreement among the parties allegedly involved in the conspiracy").

## V.    ALL CLAIMS AGAINST ABBOTT LACK PARTICULARITY.

All claims against Abbott should be dismissed for an independent reason as well: the complaint does not allege with particularity that Abbott caused the submission of any false claim. *See Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1226 (S.D. Fla. 2017) ("[A]llegations[] which do not distinguish the conduct of Defendants[] are insufficient to meet the requirements of Rule 8."). Olhausen cannot rely on guilt by association or global allegations of misconduct; Rule 9(b)'s strict standard applies "to each individual defendant's participation in the fraud." *Viridis Corp. v. TCA Global Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1361 (S.D. Fla. 2015).  The complaint does not identify a single claim that has anything to do with Abbott.  Olhausen generally alleges that Abbott directed Arriva to submit Medicare claims for services from November 2016 to December 2017, *id.* ¶¶218, 401, 428, but none of the claims he describes actually date from that period, *e.g. id.* ¶¶106-110 (claims from 2013); 176, 183 (claims from 2015); 185-86 (claims from 2012).

## CONCLUSION

For all of these reasons, Defendants respectfully request the Court dismiss the Third Amended Complaint with prejudice.

Dated: April 17, 2020      Respectfully submitted,


*/s/ Peter W. Homer*
_____
Peter W. Homer
Fla. Bar No. 291250
Gregory J. Trask
Fla. Bar No. 0055883
HOMER BONNER JACOBS ORTIZ
1200 Four Seasons Tower
1441 Brickell Ave.
Miami, FL 33131
Telephone: (305) 350-5100
Facsimile: (305) 372-2738
phomer@homerbonner.com
gtrask@homerbonner.com


Andrew A. Kassof, P.C. (*pro hac vice*)
Elizabeth S. Hess, P.C. (*pro hac vice*)
Daniel I. Siegfried (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
akassof@kirkland.com
elizabeth.hess@kirkland.com
daniel.siegfried@kirkland.com

*Attorneys for Defendants*

**CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that on April 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that foregoing document is being served this day on all counsel of record, either via transmission of Notice of Electronic Filing generated by CM/ECF in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

/s/ Peter W. Homer
Peter W. Homer
Fla. Bar No. 291250