United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America *ex rel.* Troy Olhausen, Plaintiff,<br><br>v.<br><br>Arriva Medical, LLC, and others, Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 19-20190-Civ-Scola

## Order Granting Motion to Dismiss

This matter is before the Court on the Defendants' motion to dismiss the Plaintiff's third amended complaint ("TAC"). (Defs.' Mot., ECF No. 61; TAC, ECF No. 58.) The Plaintiff in this *qui tam* action, Relator Troy Olhausen ("Olhausen"), alleges that Defendants Arriva Medical, LLC ("Arriva"), Alere, Inc. ("Alere"), American Medical Supplies, Inc., and Abbott Laboratories, Inc. ("Abbot"), either submitted or conspired to submit fraudulent Medicare billing for diabetic and other medical supplies in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (ECF No. 58 at ¶1.) The Defendants' motion raises statutory, procedural, and substantive defenses. Having reviewed the record, the parties' exceptional briefs, and the relevant legal authorities, the Court **grants** the motion to dismiss (**ECF No. 61**) for the reasons explained below.

### I.  Background

In 2011, Alere purchased Arriva, which sells mail-order diabetic testing supplies and other medical products. (ECF No. 58 at ¶¶ 44, 46.) In April 2013, Arriva acquired Olhausen's diabetic supply company, (*id.* ¶¶ 50-51), and Olhausen began to work as a Senior Vice President at Arriva, reporting directly to Arriva's president. (*Id.* ¶ 53.) Arriva also purchased Liberty Medical Supplies' ("Liberty Medical") Medicare business, which was previously owned by Express Scripts, Inc. ("Express Scripts"). (*Id.* ¶¶ 54–55.) In April 2017, Olhausen transferred from Arriva to Alere. (*Id.* ¶ 72.) Later in 2017, Abbott bought Alere and closed Arriva. (*Id.* ¶¶ 77, 79.) During his tenure at Arriva, Olhausen "participated in [Arriva's] weekly meetings" and "Arriva employees . . . report[ed] to him." (*Id.* at ¶73.)

Olhausen alleges that by virtue of his high-level positions with the companies, he learned of Arriva, Alere, and Abbott's allegedly fraudulent scheme, (*id* ¶88), to defraud the Government by: (i) improperly billing Medicare

for invalid prescriptions, (*id.* ¶¶ 89–110); (ii) improperly billing Medicare for medical supplies without obtaining the required assignments of benefits from beneficiaries, (*id.* ¶¶ 111–51); (iii) improperly billing Medicare for medically unnecessary medical devices, (*id.* ¶¶ 152–218); (iv) fraudulently certifying their 2013 and 2016 Durable Medical Equipment, Prosthetic, and Orthotic Supplies ("DMEPOS") Competitive Bidding contracts with the Centers for Medicare and Medicaid Services ("CMS"), (*id.* ¶¶ 219–57); (v) failing to disclose to CMS that they were using unaccredited locations and subcontractors who did not have supplier numbers to furnish DMEPOS related services, (*id.* ¶¶ 258–355); (vi) making unsolicited telephone contacts to beneficiaries whose names they obtained from Liberty after the purchase of Liberty's Medicare assets (patients who were not Liberty patients but whose names Liberty obtained from Express Scripts), with whom they had no prior contact in an attempt to sell diabetic supplies, (*id.* ¶¶ 356–63); and (vii) conspiring to submit false Medicare claims. (*Id.* ¶¶ 439–42.)

## II.   Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all of the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Under Federal Rule of Civil Procedure 8, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *Id.*

In applying the Supreme Court's directives in *Twombly* and *Iqbal*, the Eleventh Circuit has provided the following guidance to the district courts:

In considering a motion to dismiss, a court should 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Further, courts may infer from the factual allegations in the complaint obvious alternative explanation[s],

> which suggest lawful conduct rather than the unlawful conduct
> the plaintiff would ask the court to infer.

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (citations omitted). "This is a stricter standard than the Supreme Court described in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which held that a complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010). These precepts apply to all civil actions, regardless of the cause of action alleged. *Kivisto*, 413 F. App'x at 138.

Where a cause of action sounds in fraud, however, Federal Rule of Civil Procedure 9(b) must be satisfied in addition to the more relaxed standard of Rule 8. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," although "conditions of a person's mind," such as malice, intent, and knowledge, may be alleged generally. Fed. R. Civ. P. 9(b). "The 'particularity' requirement serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 86 (11th Cir. 2008) (citations omitted). "When a plaintiff does not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, [grounded on] baseless allegations used to extract settlements." *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002). Thus, the Rule's "particularity" requirement is not satisfied by "conclusory allegations that certain statements were fraudulent; it requires that a complaint plead facts giving rise to an inference of fraud." *W. Coast Roofing & Waterproofing*, 287 F. App'x at 86. To meet this standard, the complaint needs to identify the precise statements, documents, or misrepresentations made; the time and place of, and the persons responsible for, the alleged statements; the content and manner in which the statements misled the plaintiff; and what the defendant gained through the alleged fraud. *Id.*

With these standards in mind, the Court turns to the Plaintiffs' complaint to see whether their claims are sufficiently alleged to withstand dismissal.

**III.    Analysis**

The motion to dismiss targets each count of the TAC, which was filed in response to the Defendants' motion to dismiss the second amended complaint and after the Government declined to intervene in this action. The TAC raises six counts arising from Arriva's alleged violations of Medicare rules. Those counts concern:

- **Invalid Prescriptions (Count I).** Arriva provided DTS to patients whose prescriptions on file were allegedly invalid either because they supposedly had lapsed under state law, or because the patients had changed doctors. (*Id.* ¶¶91-99, 102, 104.)
- **Assignments of Benefits (Count II).** Arriva allegedly sent supplies without collecting signed forms from patients that Olhausen says Medicare rules required. (*Id.* ¶¶111-51.)
- **Medically Unnecessary Devices (Count III).** Arriva allegedly shipped DTS and ancillary products without ensuring patients actually needed them or that were unnecessary under Medicare rules. (*Id.* ¶¶152-218.) Relatedly, Olhausen claims Arriva instructed sales representatives to tell patients they could switch to a new brand of glucose meter despite a rule that forbids suppliers from pressuring patients to change brands. (*Id.* ¶¶219-57.)
- **Undisclosed Locations (Count IV).** When Arriva applied for and executed its 2013 and 2016 Medicare contracts, it allegedly did not disclose locations in Tennessee, Arizona, Kentucky, and the Philippines that supposedly required independent accreditation and supplier numbers. (*Id.* ¶¶258-355.)
- **Unsolicited Contacts (Count V).** After Arriva purchased another mail-order company, it allegedly called its newly acquired patients, with whom it had no prior contacts, to sell them supplies. (*Id.* ¶¶356-63.) Olhausen alleges these calls violated a statute prohibiting calls to Medicare beneficiaries under certain circumstances.
- **Conspiracy (Count VI).** Arriva allegedly conspired with its parent companies, Alere (which acquired Arriva in 2011) and Abbott (which acquired Alere in 2017), to submit false Medicare claims based on the regulatory violations alleged in Counts I-V. (*Id.* ¶440.)

The Defendants move to dismiss Counts I, III, and V based on the statutory first-to-file, government-action and public disclosure rules, and for lack of particularity. The Defendants move to dismiss Counts II and IV for lack of particularity only, as those two counts are not subject to a statutory bar.

Finally, the Defendants move to dismiss Count VI, arguing that no cognizable underlying claim has been made. The Court addresses each argument in turn.

### a. First-to-file rule

Although the FCA generally allows actions by private persons, certain restrictions apply. *See, e.g.*, 31 U.S.C. § 3730(b). One such restriction is the "first-to-file" rule, which provides that "[w]hen a person brings an action [alleging a violation of section 3729], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." *Id.* § 3730(b)(5). This means that "once one suit has been filed by a relator or by the government, all other suits against the same defendant based on the same kind of conduct would be barred." *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994). "A later filed case need not be based on the exact same facts as the earlier one in order to be barred by the first-to-file rule. The question is whether the actions are 'related.'" *U.S. ex rel. Torres v. Kaplan Higher Educ. Corp.*, Case No. 09-21733-CIV, 2011 WL 3704707, at *4 (S.D. Fla. Aug. 23, 2011) (Seitz, J.) (citations omitted). It abates only "pending" related actions "while the earlier suit remains undecided but ceases to bar that suit once it is dismissed." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S.Ct. 1970, 1978, 191 L.Ed.2d 899 (2015). Accordingly, a dismissal based solely on the first-to-file bar should be without prejudice. *See id.* at 1979; *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 174 (2d Cir. 2018).

However, in this case, Olhausen does not dispute that if the first-to-file bar does apply, then the TAC must be dismissed with prejudice under the separate "government-action" rule. Under the government-action rule, a putative relator is prohibited from bringing an FCA action "based upon allegations or transactions which are the subject of a civil suit . . . in which the Government is already a party." 31 U.S.C. §3730(e)(3). This case faces the first-to-file bar from the complaint filed *U.S. ex rel. Goodman v. Arriva Medical, LLC*, Case No. 13-CV-00760 (M.D. Tenn. Mar. 12, 2014). The operative complaint in *Goodman* was filed on March 12, 2014, and the Government later intervened in that case. Accordingly, if the first-to-file rule applies from the *Goodman* action, related claims in a related action would be subject to dismissal with prejudice. *See Wood*, 899 F.3d at 174; *Kellogg Brown*, 135 S.Ct. at 1978–79.

Assessing relatedness requires "comparing the complaints side-by-side" to see whether "the claims [in the second action] incorporate 'the same material elements of fraud' as the earlier action, even if the allegations incorporate additional or somewhat different facts or information." *U.S. ex rel. Bernier v. Infilaw Corp.*, 347 F. Supp. 3d 1075, 1083 (M.D. Fla. 2018) (quoting *U.S. ex rel.*

*Heath v. AT&T*, 791 F.3d 112, 121 (D.C. Cir. 2015)). "[T]he whole point of the first-to-file bar is to see 'whether the later [filed] complaint alleges a fraudulent scheme the government already would be equipped to investigate based on [the first] Complaint.'" *Id.* For the reasons set forth below, the Court finds that the earlier-filed *Goodman* action is sufficiently "related" to trigger the first-to-file rule with respect to Counts I, III, and V of the TAC.

### i. *Count I—Invalid Prescriptions*

First, Count I of the TAC alleges that Arriva violated the FCA by "providing supplies to its beneficiaries <u>without obtaining new, valid prescriptions</u>." (ECF No. 58 at ¶89 (emphasis added).) Similarly, the *Goodman* complaint alleged the existence of a "scheme to bill Medicare for diabetic supplies <u>before obtaining the proper prescriptions</u>." (Goodman Compl., ECF No. 61-1 at ¶82 (emphasis added).) These two counts arise from a common scheme to bill Medicare based on invalid or nonexistent prescriptions. In an effort to distinguish his allegations from Goodman's, Olhausen argues that the TAC alleges that Arriva submitted claims for expired prescriptions "across *all* clients" whereas Goodman purportedly described a scheme applicable to only *some* clients (*i.e.*, those new clients Arriva acquired through its purchase of Liberty Medical). (Pl.'s Resp., ECF No. 69 at 3 (emphasis in original).)

However, Goodman's reference to clients acquired from Liberty Medical was only an illustrative example that did not narrow the scope of clients whose supplies were billed to Medicare without proper prescriptions. (ECF No. 71 at 1.) Specifically, the Goodman complaint alleged that a "Conversion Team was *primarily* engaged in converting over former customers of Liberty Medical. However, . . . defendants employed similar conversion campaigns when they acquired *other* mail order diabetes testing suppliers . . . ." (ECF No. 61-1 at ¶71 (emphasis added).) Thus, the Goodman complaint expressly references "other" customers and only refers to Liberty Medical customers as being a "primary" – not *exclusive* – focus. The use of concrete examples to bolster allegations in a complaint is common practice. Indeed, Olhausen's own complaint specifically refers to five anonymized patients on whose behalf claims were submitted to Medicare without the necessary prescriptions. (ECF No. 58 at ¶¶ 106-110.) Just as Olhausen's reference to five specific patients does not limit the scope of Count I to only five patients, Goodman's reference to Liberty Medical clients does not limit the scope of his action to only Liberty Medical clients.

### ii. *Count III—Unnecessary Supplies and Anti-Switching Rule Violations*

The Court's analysis of whether the first-to-file rule applies to Count III of the TAC proceeds by assessing the three subparts of that count seriatim. Specifically, the parties dispute whether the first-to-file rule applies to the TAC's allegations regarding (1) glucose meters; (2) test strips, lancets, control solution, and batteries; and/or (3) heating pads, orthotics, and vacuum erection devices. For the reasons explained below, the Court finds that the first-to-file rule bars each subpart of Count III and, as a result, the Court need not and does not reach the Defendants' argument that Count III is also barred by the public disclosure rule (ECF No. 61 at 16).

*Glucose Meters*. The issue with respect to glucose meters is whether the admittedly related factual allegations can be spared from the first-to-file rule because they raise different legal theories. The parties do not dispute that both the *Goodman* complaint and Olhausen's TAC allege that Arriva made claims for medically unnecessary glucose meters or monitors. (*Compare* ECF No. 61-1 at ¶13 ("[D]efendants have fraudulently billed Medicare for thousands of glucose meters that were not medically necessary") *with* ECF No. 58 at ¶¶162-163 ("Arriva also shipped [glucose monitors] . . . regardless of whether the beneficiary indicated their current device needed replacing . . . .").) To avoid the first-to-file rule, Olhausen argues that "[b]ecause the material elements of [its fraud theories] differ substantially from those described in *Goodman*, the first-to-file rule does not bar Mr. Olhausen's claim." (ECF No. 69 at 4.) As for the "fraud theories," both complaints allege that Arriva violated the anti-switching rule (*compare* ECF No. 61-1 at ¶¶ 210, 263 *with* ECF No. 58 at ¶391), but the TAC also raises "much broader false certification and fraud-in-the-inducement theories." (ECF No. 69 at 4 (footnotes omitted).)

The Court holds that Olhausen's overlapping factual allegations are barred by the first-to-file rule, even though those allegations are used in the TAC to support "much broader" theories of fraud than the theories raised by Goodman. The Court's analysis begins with the applicable statutory text: "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action *based on the facts* underlying the pending action." 31 U.S.C. § 3730(b)(5) (emphasis added). The statute is plainly concerned with overlapping factual allegations and it is silent as to whether the fraud theories overlap. The Court now turns to the case law, and the Eleventh Circuit has explained, "once one suit has been filed by a relator or by the government, all other suits against the *same defendant based on the same kind of conduct* would be barred." *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994) (emphasis added); *see also U.S. ex rel. Torres v. Kaplan Higher Educ. Corp.*, Case No. 09-21733-CIV, 2011 WL 3704707, at *4 (S.D. Fla. Aug. 23, 2011) (Seitz, J.) ("[S]o long as a

subsequent complaint raises the same or a related claim based in significant measure on the core fact or general conduct relied upon in the first qui tam action, the § 3730(b)(5)'s first-to-file bar applies.") (citation omitted). The binding case law echoes the statutory text insofar as it reiterates that "relatedness" refers to the underlying facts. Next, the Court considers the purpose of the first-to-file rule, which is to incentivize relators to "promptly alert[] the government to the essential facts of a fraudulent scheme." *U.S. ex rel. Duxbury v. Ortho Biotech Prod., L.P.*, 579 F.3d 13, 24 (1st Cir. 2009) (quoting *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1188 (9th Cir. 2001)). The controlling statute and the Eleventh Circuit, among other circuit courts, make it clear that the first-to-file rule is triggered by duplicative facts. The rule's purpose is to identify and stop fraudulent schemes, not to incentivize factually duplicative lawsuits in order to advance fraud jurisprudence.

The Court is not persuaded by Olhausen's contrary argument, based on three non-binding cases, that a complaint alleging duplicative facts can avoid the first-to-file rule if it asserts different legal theories. Olhausen relies on a line of cases stating that, "[a]ssessing relatedness [under the first-to-file rule] requires comparing the complaints . . . [to see if they] incorporate the same material elements of fraud." (ECF No. 69 at 4 (citing *U.S. ex rel. Bernier v. Infilaw Corp.*, 347 F. Supp. 3d 1075, 1083 (M.D. Fla. 2018) (internal quotations and citation omitted); *see also U.S. v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 495 (D.S.C. 2016) (describing first-to-file bar as applicable to complaints "based on the same material elements of fraud"); *U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 2118 (D.C. Cir. 2003) (same)).) As an initial matter, to the extent Olhausen interprets the "same material elements of fraud" language to mean that the first-to-file rule applies to complaints that assert the same legal theories and not the same facts, his interpretation is inconsistent with both the applicable statutory language and the Eleventh Circuit's decision in *Cooper*. However, upon closer review, the language of the cases cited by Olhausen can be reconciled with the first-to-file rule's focus on factual allegations as opposed to legal theories or particular causes of action. The "same material elements of fraud" language used in those cases comes from *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, where the Ninth Circuit reiterated that the objective of the related "facts" standard of the first-to-file rule is to discourage "piggyback claims, which would have no additional benefit for the government, since once the government *knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds.*" 243 F.3d 1181, 1189 (9th Cir. 2001) (emphasis added). Thus, the "same material elements of fraud" language refers not to the various causes of action that may be supported by a related set of facts, but it instead refers to

the factual elements of an underlying fraudulent scheme. Finally, the Court agrees with the holding of the one case presented in the parties' briefs that actually turned on this issue, which held that "a focus on the theory of fraud is inconsistent with the statutory language . . . which expressly focuses on 'the facts.'" *U.S. v. Unisys Corp.*, 178 F. Supp. 3d 358, 369 (E.D. Va. 2016) (The relator's "argument, which is based on the distinction between the *type of fraud* alleged, is unpersuasive.") (emphasis in original). As the parties do not dispute the material relatedness of the facts alleged in this subpart of Count III, the Court finds that it is barred by the first-to-file rule.

    <u>Test strips, lancets, control solution, and batteries</u>. The second subpart of Count III alleges a scheme whereby the Defendants bundled together test strips, lancets, control solution, and batteries, then shipped and billed for them without regard to medical necessity. (ECF No. 58 at ¶¶ 156-61.) The parties do not dispute that Olhausen's allegations are broader than Goodman's allegations. Although both complaints allege that the Defendants shipped unnecessary testing strips (*compare id.* at ¶392 *with* ECF No. 61-1 at ¶237), only Olhausen's complaint alleges that the unnecessary testing strips were bundled with additional unnecessary products (*see, e.g.*, ECF No. 58 at ¶157). Additionally, Goodman alleged that the scheme to ship unnecessary testing strips began in June 2013 (ECF No. 61-1 at ¶237) whereas Olhausen alleged that he became aware of such a scheme "[a]s of April 2013" and that it lasted until 2015 (ECF No. 58 at ¶¶ 152, 160).

    Thus, the question is whether Olhausen's allegations concerning the shipment of and billing for medically unnecessary products may avoid the first-to-file rule where Olhausen's complaint, compared to Goodman's, (1) refers to additional "bundled" products and (2) identifies an earlier start date and precise end date of the scheme. The Court holds that notwithstanding these additional details, Olhausen's allegations concerning the shipment of unnecessary medical products are still barred by the first-to-file rule. As explained above, "once one suit has been filed by a relator or by the government, all other suits against the *same defendant based on the same kind of conduct* would be barred." *Cooper*, 19 F.3d at 567. Further, as a general matter, "[s]imply alleging additional facts as to how the fraud occurred does not avoid the first-to-file bar." *Torres*, 2011 WL 3704707, at *5.

    Relying on these fundamental principles of the first-to-file rule, the court in *U.S. ex rel. LaFauci v. AbbVie Inc.*, dismissed a complaint under the first-to-file rule where its allegations regarding billing for additional unnecessary drugs "involve[d] similar wrongdoing [as alleged in the first complaint], just in different business lines." 2019 WL 1450791, at *4 (D.N.J. Apr. 2, 2019). Olhausen attempts to distinguish *LaFauci* on the grounds that it "merely

reflects the same fraudulent scheme but involving different brands of medication." (ECF No. 59 at 5.) However, the Court finds *LaFauci* to be analogous and an apposite application of the general principle that a second complaint cannot avoid the first-to-file rule by alleging additional details concerning the same kind of scheme. Turning to the case at bar, the Court finds that the Government, put on notice by Goodman of the shipment of boxes containing packages of medically unnecessary test strips, would be equipped to investigate whether other medical products within those very same boxes were unnecessary. As such, Olhausen's complaint is related to Goodman's such that it is barred by the first-to-file rule.

The Court also finds that Olhausen's additional allegations regarding the duration of the scheme so closely overlap with Goodman's allegations that these duration allegations also trigger the first-to-file rule. In short, Olhausen alleges that the scheme lasted from April 2013 into the year 2015. By contrast, Goodman alleges that the scheme "began" in June 2013 and does not allege an end date. At bottom, the difference is that Olhausen put the Government on notice that this multi-year scheme began two months earlier than Goodman claims it began. However, Olhausen provides no authority – and the Court doubts any exists – for the proposition that the Government's investigation of Goodman's allegations could only look prospectively from June 2013. On the contrary, it stands to reason that when Goodman apprised the Government of a scheme that began in June 2013, the Government was equipped to investigate the origins of that scheme and uncover that it began, as Olhausen alleges, weeks or months earlier. In sum, the factual and durational details offered by Olhausen do not render the TAC sufficiently distinct from Goodman's complaint.

*Heating pads, orthotics, and vacuum erection devices.* The last subpart of Count III alleges that Arriva instructed its employees to send heating pads, orthotics, and vacuum erection devices "without checking with the beneficiary or the beneficiary's doctor as to whether [that group of products] was medically necessary." (ECF No. 58 at ¶166.) Similarly, Goodman alleges that the Defendant attempted to "up-sell" these products to beneficiaries "on every phone call the associates made" and to market these devices "to every patient." (ECF No. 61-1 at ¶¶ 154-155.) Olhausen argues that his allegations of medically unnecessary sales of these products are different from  Goodman's allegation that associates would "up-sell" these devices "to every patient" because Goodman never expressly used the phrase "medically unnecessary." (ECF No. 69 at 5.) The Court is not persuaded. In the broader context of Goodman's False Claims Act *qui tam* complaint, it would be clear to the Government, which intervened in that case, that allegations of rampant and

aggressive tactics of up-selling medical devices to *every* patient strongly suggested that at least some of those devices were "medically unnecessary," even if Goodman did not always repeat that particular phrase.

   *i.*   *Count V—Unsolicited Contacts*

The last count that the Defendants allege is barred by the first-to-file rule is Count V, which alleges that Arriva improperly contacted Express Scripts patients whose names and contact information Liberty Medical obtained from Express Scripts. (ECF No. 58 at ¶¶ 356-63.) This allegedly violated 42 U.S.C. § 1395m(a)(17), which provides that suppliers may only contact an individual regarding the furnishing of a covered item if that individual has given written permission to the supplier, the supplier has previously furnished a covered item to the individual before and is calling regarding that item, or if the supplier furnished at least one covered item to the individual during the 15 months preceding the date the supplier makes contact. Olhausen claims that this regulation was "knowingly violated" when Arriva contacted Express Scripts patients who had no prior relationship with Arriva. (ECF No. 58 at ¶¶ 359, 362.) Similarly, Goodman alleged that Arriva "forc[ed] its conversion representatives to cold call patients who had *never* purchased covered items from Arriva," and in doing so "Defendants clearly violated 42 U.S.C. § 1395m(a)(17)." (ECF No. 61-1 at ¶222 (emphasis in original).) Although these allegations are virtually identical, Olhausen argues that, "taken in context," Goodman's complaint only referred to unsolicited contacts with Liberty Medical patients whereas Olhausen's complaint refers to unsolicited contacts with Express Scripts patients. Following the same principles set forth throughout the Court's first-to-file analysis, the Court finds that Goodman's allegations equipped the Government to investigate Arriva's alleged practice of making unsolicited contacts, no matter the source of those contacts.

   **b. Counts II and IV Lack Particularity**

The Defendants argue that Counts II and IV, the only counts that are not subject to a statutory bar, must be dismissed because they lack sufficient particularity. Federal Rule of Civil Procedure 9(b) requires a party "alleging fraud or mistake . . . [to] state with particularity the circumstances constituting fraud or mistake." To satisfy this particularity standard in a *qui tam* action, a relator must allege the actual "submission of a [false] claim" because "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless . . . the provider . . . asks the Government to pay amounts it does not owe." *U.S. ex*

*rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). The complaint also must offer "some indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the Government." *Id.* (emphasis in original). It is not enough that a relator "merely . . . describe[s] a private scheme in detail [and] then . . . allege[s] simply and without any stated reason . . . his belief that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted." *Id.* Nor may he point to "improper practices of the defendant[]" to support "the inference that fraudulent claims were submitted" because "submission . . . [can]not [be] inferred from the circumstances." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005). Indeed, even if the relator is an insider who alleges awareness of general billing practices, an accusation of "[u]nderlying improper practices alone [is] insufficient . . . absent allegations that a specific fraudulent claim was in fact submitted to the government." *Id.* at 1014 (emphasis added). In short, he must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (citation omitted).

   None of Olhausen's claims adequately allege that a fraudulent claim was in fact submitted to the Government. Olhausen concedes that he did not include "exact billing data or attach a representative sample claim" that was submitted for reimbursement, but he instead points to Eleventh Circuit authority for the proposition that exact billing data or a sample submitted claim is unnecessary where the complaint "establish[es] the necessary indicia of reliability that a false claim was actually submitted." (ECF No. 69 at 6 (quoting *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014)).) Such "indicia of reliability" may exist where the relator has "direct, first-hand knowledge of the defendants' submission of false claims gained through [his] employment with the defendants . . . ." *Id.* Olhausen also cites to *Hill v. Morehouse Med. Assocs., Inc.*, where the Eleventh Circuit held that since the relator in that case was an employee with firsthand knowledge of the alleged fraudulent submissions, her allegations had the requisite indicia of reliability necessary to allege a fraudulent scheme. No. 02-14429, 2003 WL 22019936, at *5 (11th Cir. Aug. 15, 2003). The Eleventh Circuit has also sustained complaints that did not expressly identify a specific submission of a false claim, but where the relator nevertheless "allege[d] personal knowledge or participation in the fraudulent conduct." *U.S. ex rel. Matheny v. Medco Health Solutions,* Inc., 671 F.3d 1217, 1230 (11th Cir. 2012). Similarly, a complaint that did not identify a fraudulent submission was sustained where the relator was a nurse who personally used incorrect billing codes on a consistent basis and was told by the "office administrator" that the defendant healthcare

provider "'never' billed [these fraudulent services] in another manner." *U.S. ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005).

Thus, in the absence of an allegation identifying the submission of a false claim, the question before the Court is whether Olhausen's allegations have nevertheless provided the necessary indicia of reliability to show that a fraudulent scheme took place. To bring the TAC within the realm of complaints that may survive dismissal without expressly identifying a submission of a fraudulent claim, Olhausen argues that he has "direct, first-hand knowledge of Defendants' submission of false claims gained through his employment with Defendants." (ECF No. 69 at 7.) In support of that argument, he claims that he "learned of the practices alleged" in the TAC "[t]hrough his high-level position with the company." (ECF No. 58 at ¶88.) This "high level position" was Olhausen's role "as Arriva's Sr. Vice President of Business Development and Marketing, reporting directly to Arriva's President." (*Id.* at ¶53.) In that position, Olhausen alleges that he "participated in [Arriva's] weekly meetings" and "Arriva employees . . . report[ed] to him." (*Id.* at ¶73.)

Olhausen has not put forth the indicia of reliability that would excuse him from the general rule that a relator must identify a submission of a fraudulent bill. Olhausen's allegations are a far cry from those of the relator in *Mastej* who attended weekly meetings where "every patient was reviewed, including how the services were being billed to each patient"; or the relator in *Hill* who "worked in the very department where . . . the fraudulent billing schemes occurred" and "observed [workers] alter various . . . codes . . . and thus submit false claims"; or the employees in *Matheny* who alleged that they personally participated in a fraudulent scheme; or the nurse in *Walker* who alleged that she personally entered incorrect billing codes. *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014); *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003); *U.S. ex rel. Matheny v. Medco Health Solutions*, Inc., 671 F.3d 1217, 1230 (11th Cir. 2012); *U.S. ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005). Merely "participat[ing] in . . . weekly meetings," receiving "reports" from employees, and reporting to the President, may establish that Olhausen was an "insider," but it does meaningfully aid the Court in its search for "indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311. After all, the act of submitting a fraudulent claim to the government is the "*sine qua non* of a False Claims Act violation." *Id.*

As the TAC fails at the threshold, the Court need not go on to determine whether the unparticularized billing allegations would fail or satisfy the generic fraud elements of falsity, scienter, and materiality. As explained immediately above, Counts II and IV lack particularity with respect to the submission of a fraudulent bill. Earlier, the Court found that Counts I, III, and V are barred by the first-to-file rule and must be dismissed with prejudice under the government-action rule. The only remaining count is Count VI, which the Court turns to next.

### c) Count VI—Conspiracy

The parties agree that Count VI, for conspiracy to commit the alleged FCA violations, cannot stand if the Court finds that the TAC fails to adequately allege underlying FCA violations. As the Court has concluded that the TAC fails to adequately allege FCA violations, Count VI must be and is dismissed.

## IV. Conclusion

Accordingly, the Court **grants** the Defendants' motion to dismiss (**ECF No. 61**). Counts I, III and V are dismissed **with prejudice** under the first-to-file and government-action rules. Olhausen has not requested leave to amend; nor has he indicated in his response to the motion to dismiss any inclination whatsoever to do so. The Court thus dismisses Counts II, IV, and VI **without prejudice** and **without leave to amend**. *Wagner v. Daewoo Heavy Industries Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."); *Avena v. Imperial Salon & Spa, Inc.*, 17-14179, 2018 WL 3239707, at *3 (11th Cir. July 3, 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend.").

The Clerk of Court is directed to **close** this case. Any pending motions are **denied as moot**.

**Done and ordered** in chambers, at Miami, Florida, on August 26, 2020.

Robert N. Scola, Jr.
United States District Judge