United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America *ex rel.* Troy Olhausen, Plaintiff,<br><br>v.<br><br>Arriva Medical, LLC, and others, Defendants. | )<br>)<br>)<br>)<br>) Civil Action No. 19-20190-Civ-Scola<br>)<br>)<br>) |

**Order Granting Motion to Dismiss**

This matter is before the Court on the Defendants' renewed motion to dismiss the Plaintiff's third amended complaint ("TAC"). (Defs.' Mot., ECF No. 109; TAC, ECF No. 58.) The Plaintiff in this *qui tam* action, Relator Troy Olhausen ("Olhausen"), alleges that Defendants Arriva Medical, LLC ("Arriva"), Alere, Inc. ("Alere"), American Medical Supplies, Inc., and Abbott Laboratories, Inc. ("Abbot"), either submitted or conspired to submit fraudulent Medicare billing for diabetic and other medical supplies in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (ECF No. 58 at ¶1.) Olhausen has filed a response (ECF No. 113), and the Defendants have filed a reply (ECF No. 117.) The Defendants' motion raises statutory, procedural, and substantive defenses. Having reviewed the record, the parties' briefs, and the relevant legal authorities, the Court **grants** the motion to dismiss (**ECF No. 109**) for the reasons explained below.

I. **Background**

   A. **Factual Background**

In 2011, Alere purchased Arriva, which sells mail-order diabetic testing supplies and other medical products. (ECF No. 58 at ¶¶ 44, 46.) In April 2013, Arriva acquired Olhausen's diabetic supply company, (*id.* ¶¶ 50-51), and Olhausen began to work as a Senior Vice President at Arriva, reporting directly to Arriva's president. (*Id.* ¶ 53.) Arriva also purchased Liberty Medical Supplies' ("Liberty Medical") Medicare business, which was previously owned by Express Scripts, Inc. ("Express Scripts"). (*Id.* ¶¶ 54–55.) In April 2017, Olhausen transferred from Arriva to Alere. (*Id.* ¶ 72.) Later in 2017, Abbott bought Alere and closed Arriva. (*Id.* ¶¶ 77, 79.) During his tenure at Arriva, Olhausen "participated in [Arriva's] weekly meetings" and "Arriva employees . . . report[ed] to him." (*Id.* at ¶73.)

Olhausen alleges that by virtue of his high-level positions with the companies, he learned of Arriva, Alere, and Abbott's allegedly fraudulent scheme, (*id* ¶88), to defraud the Government by: (i) improperly billing Medicare for invalid prescriptions, (*id.* ¶¶ 89–110); (ii) improperly billing Medicare for medical supplies without obtaining the required assignments of benefits from beneficiaries, (*id.* ¶¶ 111–51); (iii) improperly billing Medicare for medically unnecessary medical devices, (*id.* ¶¶ 152–218); (iv) fraudulently certifying their 2013 and 2016 Durable Medical Equipment, Prosthetic, and Orthotic Supplies ("DMEPOS") Competitive Bidding contracts with the Centers for Medicare and Medicaid Services ("CMS"), (*id.* ¶¶ 219–57); (v) failing to disclose to CMS that they were using unaccredited locations and subcontractors who did not have supplier numbers to furnish DMEPOS related services, (*id.* ¶¶ 258–355); (vi) making unsolicited telephone contacts to beneficiaries whose names they obtained from Liberty after the purchase of Liberty's Medicare assets (patients who were not Liberty patients but whose names Liberty obtained from Express Scripts), with whom they had no prior contact in an attempt to sell diabetic supplies, (*id.* ¶¶ 356–63); and (vii) conspiring to submit false Medicare claims. (*Id.* ¶¶ 439–42.)

Based on this alleged misconduct, Olhausen brought six causes of action: (1) false claims for invalid prescriptions (Count I); (2) false claims for failure to obtain authorizations of benefits (Count II); (3) false claims for submitting claims for medical unnecessary medical items (Count III); (4) false claims submitted by undisclosed, unaccredited locations (Count IV); (5) unsolicited contacts (Count V); and conspiracy, which is a derivative claim that can only move forward if any other claim is viable (Count VI). (*See id.* at 68-79.) As explained below, the only counts before the Court are Counts II and VI.

### B. Procedural Background

On August 26, 2020, the Court granted the Defendants' motion to dismiss all claims. (Order Granting Mot. to Dismiss, ECF No. 74.) The Court dismissed Counts I, III and V with prejudice based on the FCA's first-to file rule (*see id.* at 5-11), and Counts II, IV and VI without prejudice and without leave to amend for lack of particularity. (*Id.* at 11-14.) The Court then denied Olhausen's motion for reconsideration of the Court's order denying leave to amend. (Order Denying Mot. for Reconsideration and for Leave to Amend, ECF No. 82.)

Olhausen appealed, but only with respect to the Court's dismissal of Counts II, IV and VI—in other words, Olhausen did not appeal (1) the Court's dismissal of Counts I, III and V nor (2) the Court's denial of his attempt to

amend his complaint. (Defs.' Mot. to Dismiss Ex. A, Pl.'s Appellate Brief, ECF No. 109-1.)

On July 28, 2022, the Eleventh Circuit issued its mandate affirming the Court's dismissal in full. (Mandate of Eleventh Circuit, ECF No. 88; *see also Olhausen v. Arriva Medical, LLC*, 2022 WL 1203023 (11th Cir. April 22, 2022).) However, after the Supreme Court clarified the scienter element of an FCA claim in *Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023), the Supreme Court likewise vacated the Eleventh Circuit's 2022 decision. *See Olhausen v. Arriva Medical, LLC*, 143 S.Ct. 2686 (Mem.) (2023). On January 21, 2025, the Eleventh Circuit issued a subsequent mandate, vacating the Court's dismissal of Counts II and VI but affirming the dismissal of Count IV "in its entirety." (Mandate of Eleventh Circuit, ECF No. 92 at 39; *see also Olhausen v. Arriva Medical, LLC*, 124 F.4th 851 (11th Cir. 2024).) The Eleventh Circuit remanded Counts II and IV for the Court "to consider in the first instance" whether Olhausen adequately pled "falsity, scienter, and materiality," and "whether the regulations require signatures and assignments of benefits for the claims in Count II in the first place." (*Id.* at 34.)

This Court then denied Olhausen's motion for leave to file a fourth amended complaint. (Order Denying Pl.'s Mot. for Leave to File Fourth Amended Compl., ECF No. 99; Order Denying Pl.'s Mot. for Reconsideration and Mot. for Leave to Amend, ECF No. 101.) The Defendants then filed their renewed motion to dismiss the TAC with prejudice.

## II. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all of the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Under Federal Rule of Civil Procedure 8, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive dismissal. *Id.*

In applying the Supreme Court's directives in *Twombly* and *Iqbal*, the Eleventh Circuit has provided the following guidance to the district courts:

> In considering a motion to dismiss, a court should 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Further, courts may infer from the factual allegations in the complaint obvious alternative explanation[s], which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011) (citations omitted). "This is a stricter standard than the Supreme Court described in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which held that a complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010). These precepts apply to all civil actions, regardless of the cause of action alleged. *Kivisto*, 413 F. App'x at 138.

### III. Analysis

The Defendants believe that Olhausen fails to plead (1) falsity, (2) materiality, (3) scienter, and (4) its derivative conspiracy claim. The Defendants also ask this Court to dismiss the complaint with prejudice.

Because this Court finds that Olhausen fails to plead materiality, the Court normally would not analyze the Defendants' other bases for dismissal. *See, e.g., In re Jan. 2021 Short Squueze Trading Lit.*, 105 F.4th 1346, 1350 (11th Cir. 2024) (declining to analyze other issues where one issue was "dispositive of [the plaintiffs'] claim"). However, the Eleventh Circuit has instructed the Court that it "should consider in the first instance whether Olhausen's complaint sufficiently alleges the other challenged elements of Count II: falsity, scienter, and materiality." (Mandate of Eleventh Circuit, ECF No. 92 at 6.) The Court likewise believes it is prudent to do so given the inevitability of an appeal (and that many of these issues are issues of first impression).

#### A. General Principles

In Count II, Olhausen alleges that the Defendants violated 31 U.S.C. §§ 3729 (a)(1)(A) & (b) when it sent medical supplies without collecting signed

forms from patients that Olhausen believes Medicare rules required. (TAC ¶¶ 111-51, 371-382.)

"Subsection (a)(1)(A) provides liability, in general, for 'any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *Olhausen v. Arriva Medical, LLC*, 124 F.4th 851, 856 (11th Cir. 2024) (quoting 31 U.S.C. § 3729(a)(1)(A) (2009)). "Subsection (a)(1)(B) declares liable 'any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." (*Id.*) (quoting 31 U.S.C. § 3729(a)(1)(B)).

Therefore, to adequately plead an FCA claim under either provision, Olhausen must plead "the existence of a false claim or statement, the materiality of that false claim or statement, and scienter." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299 (11th Cir. 2021) (citation omitted).

### B. Falsity

As relevant here, "[a] claim is false when a person or entity fails to comply with statutory, regulatory, or contractual requirements but certifies that it complied with them." *Id.* (citing, *inter alia, Universal Health Services Inc., v. United States ex rel. Escobar*, 579 U.S. 176, 186–88, 136 S. Ct. 1989, 195 L.Ed.2d 348 (2016)).

The Defendants believe that Olhausen cannot plead falsity for three reasons: (1) Arriva was a participating supplier exempt from collecting assignments; (2) Arriva was statutorily allowed to submit claims for mail-order supplies without collecting assignments; and (3) Arriva's interpretation of the Medicare rules was reasonable and therefore not false. Therefore, the first issue with respect to Count II is whether Arriva was required to collecting assignments. If Arriva was not required to collect such assignments, the Defendants cannot be held liable for its alleged failure to do so.

The Court takes these issues in a slightly different order than presented. It will first discuss whether Arriva could submit claims for mail-order supplies without first collecting assignments, and then whether Arriva was a "participating supplier."

1. <u>Arriva was not statutorily allowed to submit claims for mail-order supplies without first collecting assignments</u>

The Defendants believe that Arriva was not required to collect assignments because "[a] mail-order supplier that submits claims involving far-

away patients is not obliged to collect paperwork from those patients." (Defs.' Mot., at 6.) Under 42 C.F.R. § 424.36(c), "[i]f a . . . supplier files a claim for services that involved no personal contact between the . . . supplier and the beneficiary . . . [a] supplier may sign the claim on the beneficiary's behalf." The Defendants argue that there was "no personal contact" between Arriva and beneficiaries because "Arriva interacted with patients only by phone and mail—not in-person as required for 'personal contact.'" (Defs.' Mot., at 6 (quoting § 424.36(c)).

The regulations do not define "personal contact." The Defendants thus cite to dictionary definitions that define "personal" as "[d]one, made, or performed in person." (*Id.* at 6-7 (quoting The Am. Heritage Dict. 1317 (5th ed. 2011); Webster's II New College Dict. 841 (2005)).

However, in doing so, the Defendants give incomplete definitions of "personal." "Personal" may also mean "carried on between individuals directly." *See* "Personal." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/personal. Accessed May 14, 2025. Amongst various definitions, "directly" means "in a direct manner." *See* "Directly." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/directly. Accessed May 14, 2025. Combining these two definitions, "personal contact" includes that contact that is "carried on between individuals" "in a direct manner." There is no requirement in this definition for the "personal contact" to be in-person.

In fact, the definitions within the regulations that the Defendants believe support its argument do the opposite. "Direct contact" in 42 § C.F.R. 424.210(a)(iii) includes contacts that are "in-person, by telephone, or via other telecommunications technology." Furthermore, 42 C.F.R. § 414.408(j)(5)(i)(C)(1) notes that direct contact includes "phone call[s]." Given that the dictionary definition of "personal" includes actions carried on "directly," and the regulations consistently include telephone contact as "direct" contact, the Court is unpersuaded by the Defendants' arguments that "personal contact" requires an "in-person" element.  Therefore, 42 C.F.R. § 424.36(c) did not exempt Arriva from collecting assignments.

2. The Court Cannot Determine Whether Arriva Was a "Participating Supplier"

Suppliers of medical equipment are normally required to collect assignments of claims from beneficiaries. *See* 42 C.F.R. § 424.55(a) ("Medicare pays the supplier for covered services if the beneficiary (or the person authorized to request payment on the beneficiary's behalf) assigns the claim to

the supplier and the supplier accepts assignment.") But there is an exception: "when payment is for services furnished by a *participating physician or supplier*, the beneficiary (or the person authorized to request payment on the beneficiary's behalf) *is not* required to assign the claim to the supplier in order for an assignment to be effective." *Id.* § 424.55(c) (emphasis added). Put into laymen terms, "participating supplier[s]" are not required to collect assignments. A "participating supplier," in turn, is "a supplier that has an agreement with CMS to participate in Part B of Medicare in effect on the date of the service." 42 C.F.R. § 400.202. "Part B of Medicare" is defined as "the supplementary medical insurance program . . . ." *Id.*

Olhausen alleges that early in 2013, Arriva was awarded a durable medical equipment, prosthetics, orthotics, and supplies ("DMEPOS") contract with CMS "to bill for mail order diabetic supplies." (TAC ¶¶ 53-54, 238-40.) Olhausen concedes that diabetic supplies fall under Part B of Medicare. (*See id.* ¶¶ 31-43.) Thus, to the Defendants, Arriva was a "participating supplier" because it "had an agreement with CMS to participate in Part B of Medicare" at the time of the alleged misconduct. (*See* Defs.' Mot., at 11.) And as a "participating supplier," so the Defendants' argument goes, Arriva was exempt from collecting assignments. (*Id.*)

Olhausen does not believe that the Court's analysis should be so simple. He notes that "Arriva's Medicare contract was specific to the DMEPOS competitive bidding program, which is explicitly identified in its contract." (Pl.'s Resp., at 8 (citing TAC ¶¶ 235-36, 240).) He thus believes that Arriva was a "contract supplier" "under a competitive bidding program." (*Id.* at 7-8 (quoting § 42 C.F.R. §§ 414.402).) So, Olhausen's reasoning goes, Arriva was "not a 'participating supplier' when it submitted claims for such items." (*Id.* at 8.)

Whether a supplier who only has a contract specific to the DMEPOS competitive bidding program is a "participating supplier" is seemingly a matter of first impression; neither party cites case law on the issue, and this Court has likewise not found case law on point.

The Court has considered the parties' briefs, and has conducted its own analysis. The Court finds that the issue of whether Arriva was a "participating supplier" has been inadequately briefed, for the reasons set forth below.

"The Supreme Court first declared in *Bowles v. Seminole Rock & Sand Co.* that when 'the meaning of [a regulation] is in doubt,' the agency's interpretation 'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *United States v. James*, 135 F.4th 1329, 1333 (11th Cir. 2025) (quoting *Seminole Rock*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). This deference is known as either *Seminole Rock* or *Auer* deference, after the name of the Supreme Court case that reaffirmed

*Seminole Rock*. *See id.*; *see also Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Importantly, the Eleventh Circuit in *James* clarified that *Seminole Rock* or *Auer* deference is still the law in this circuit after the Supreme Court overruled *Chevron* deference in *Loper Bright Enterprises v. Raimondo* because that case "dealt with agency interpretations of ambiguous statutes, not agency interpretations of their own regulations . . . ." *James*, 135 F.4th at 1334 n.1 (citing *Loper Bright*, 603 U.S. 369, 413, 144 S.Ct. 2244, 219 L.Ed. 2d 832 (2024)). Under *Seminole Rock* or *Auer* deference,

> [A] court may defer to an agency's interpretation of its own regulation only when (1) the regulation is "genuinely ambiguous after exhausting 'all the traditional tools' of construction;" (2) the agency's interpretation is reasonable, meaning it falls "within the zone of ambiguity the court has identified"; and (3) after the court makes "an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight."

*Id.* at 1333 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 574-76, 139 S.Ct. 2400, 204 L.Ed.2d 841 (2019)).

"[A] regulation may be genuinely ambiguous if the rule does 'not directly or clearly address every issue,' 'prove[s] susceptible to more than one reasonable reading,' fails to capture 'specialized and varying' subject matter in its every detail,' or leaves 'no single right answer' to the 'interpretive question.'" *Id.* (citing *Kisor*, 588 U.S. at 566, 575, 139 S.Ct. 2400).

The Court thus begins its analysis with well-established principles of statutory construction. The Court's "authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction." *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010) (citations omitted). The Court must not "look at one word or term in isolation but rather look to the entire statute and its context." *Id.* (citation omitted). This is especially true here, where "[t]he Medicare program . . . is governed by a notoriously complex statute." *Advocate Christ Med. Center v. Kennedy*, 605 U.S. ––, 145 S.Ct. 1262, 1266 (2025).

Using these principles, the Court finds that the definition of "participating supplier" is "genuinely ambiguous." *See James*, 135 F.4th at 1333. Specifically, it is not clear from CMS's definition of "participating supplier" whether "an agreement with CMS to participate in Part B of Medicare" refers to *any* agreement with CMS to participate in *any* part of Medicare Part B or, on the contrary, whether CMS meant to refer to an agreement with CMS to

participate in Medicare Part B *as a whole. See* 42 C.F.R. § 400.202. The former interpretation—in which any agreement to participate in any part of Medicare Part B excuses collecting assignments, even for items unrelated to that agreement—is seemingly at odds with the purpose of assignments, which is "in part, to reduce Medicare fraud." *Olhausen*, 124 F.4th at 856-57; *see also Kisor*, 588 U.S. at 575 (explaining that determining ambiguity requires consideration of "the text, structure, history, and *purpose* of the regulation" (emphasis added)).

The Defendants argue that the regulations do not state, for example, that a "participating supplier" is one who "has an agreement with CMS to participate in Part B of Medicare in effect on the date of the service but only for the at-issue item . . . ." (Defs.' Reply, at 7-8.) But the opposite is true as well: the definition of "participating supplier" does not state that a "participating supplier" is one who "has any agreement with CMS to participate in any part of Part B of Medicare." Thus, it seems to this Court that CMS's definition of "participating supplier," at the very least, "does 'not directly or clearly address every issue,'" and "fails to capture 'specialized and varying' subject matter in 'its every detail.'" *James*, 135 F.4th at 1333 (quoting *Kisor*, 588 U.S. at 566, 575, 139 S.Ct. 2400). As the Eleventh Circuit noted, the Medicare rules at issue "are susceptible to multiple reasonable interpretations." *See Olhausen*, 2022 WL 1203023, at *2; *see also James*, 135 F.4th at 1333 (citing *Kisor*, 588 U.S. at 566). Thus, the Court must proceed to *Kisor*'s step two. *See id.* at 1333-34.

However, the parties have not briefed what CMS's interpretation of "participating supplier" is. Therefore, the Court cannot decide whether CMS's interpretation is reasonable and if it is, whether Arriva was required to collect assignment of benefits.[1] Because the Defendants have the burden on a motion

---

[1] The Court notes that CMS seemingly interprets "participating supplier" is a way that would preclude finding that Arriva became a "participating supplier" merely because it signed a contract specific to DMEPOS. For example, CMS requires organizations to sign CMS-460, the "Medicare Participating Physician or Supplier Agreement." *See* Form No. CMS-460 (OMB No. 0938-0373), at 1. By signing that form, an organization "enters into an agreement with the Medicare program to accept assignment of the Medicare Part B payment for all services for which the participant is eligible to accept assignment under the Medicare law and regulations . . . ." *Id.* In its summary published in the Federal Register, CMS noted that this form is to be "completed by nonparticipating physicians and suppliers if they choose to participate in Medicare Part B" and by doing so, the "supplier agrees to take assignment on all Medicare claims." And, "[i]n exchange for signing the agreement, the . . . supplier receives a significant number of program benefits not available to nonparticipating suppliers." 71 Fed. Reg. 5850 (Feb. 3, 2006).

to dismiss, the Court will assume, solely for the purpose of analysis, that Arriva was required to collect assignments.

### 3. Whether Arriva's Interpretation of its Statutory Requirements Was Objectively Reasonable is Not Dispositive on the Element of Falsity

The Defendants believe that even if its interpretations of its regulatory requirements were incorrect (and that it had to collect assignments), Olhausen is unable to plead falsity "because Arriva's view was not 'objectively false.'" (Defs.' Mot., at 8 (quoting *Bell v. Cross*, 2021 WL 5544685, at *3 (11th Cir. Nov. 26, 2021)). In making this argument, the Defendants note that the Eleventh Circuit characterized the Defendants' statutory interpretations as "objectively reasonable." *Olhausen*, 2022 WL 1203023, at *2.[2]

The Court assumes for the moment, as the Defendants do in making this argument, that Arriva's interpretation of its statutory requirements was incorrect.

Given that caveat, the Court disagrees with the Defendants' argument. To start, the Eleventh Circuit's statement that the Defendants' statutory interpretations are "objectively reasonable" was in the context of the scienter element of an FCA claim, *not* falsity. *See Olhausen*, 2022 WL1203023, at *2. And more importantly, the Supreme Court vacated the Eleventh Circuit's opinion following its own decision in *Schutte*, in which the Supreme Court held that scienter in the FCA context "refers to [a defendant's] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Schutte*, 598 U.S. at 749. The Eleventh Circuit's statement that the Defendants' beliefs were "objectively reasonable" are thus doubly irrelevant to the falsity element of an FCA claim.

*Bell v. Cross* is similarly irrelevant. There, the Eleventh Circuit noted that "in order for a clinical judgment to be 'false' in the context of the FCA, it must be *objectively* false, meaning that it 'contains a flaw that can be demonstrated through verifiable facts.'" *Bell*, 2021 WL 5544685, at *2. In contrast to *Bell*, the Court here must determine whether or not Arriva was required to collect assignments. That is not a matter of clinical judgment, but rather an issue of statutory interpretation. Should it ultimately be determined that the

---

[2] In their reply, the Defendants argue, for the first time, that "Olhausen does not even plead a real misstatement" because "§ 424.36(c) allowed Arriva to sign for beneficiaries[.]" (Defs.' Reply, at 10.) Because the Defendants raised this argument for the first time in their reply, the Court will not consider it. In any event, the Court disagrees with the Defendants' interpretation of § 424.36(c).

Defendants were required to collect such assignments, their belief that they were not required to do so would be *objectively* false.

The Defendants are concerned that "the sheer complexity of Olhausen's novel regulatory theories . . . cautions against imposing punitive liability." (Defs.' Reply, at 6.) They also warn that "[a] defendant need not hope that it reached the best interpretation to avoid treble-damages punishment." (Defs.' Resp., at 8.) The Defendants make these arguments in the wrong place. In the context of Olhausen's assignment-of-benefits claim, the Defendants' state of mind is relevant to scienter rather than falsity.

### C. Materiality

Next, the Defendants argue that Olhausen fails to adequately plead materiality. For an FCA claim to be material, the violation must be "material to the Government's payment decision." *Univ. Health Servs., Inc. v. United States*, 579 U.S. 176, 181. The Defendants raise five arguments as to why Olhausen has failed to plead materiality. (Defs.' Mot., at 8-12.) Because the Court finds that Olhausen has failed to plead with particularity materiality (which is the Defendants' fourth argument on materiality), the Court need not consider the Defendants' arguments on materiality.

"The term material means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Univ. Health Servs.*, 589 U.S. at 192-93 (cleaned up). Because the FCA "is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations," [t]he materiality standard is demanding." *Id.* at 194 (internal citations omitted). As such, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]." *Id.* at 192.

Here, Olhausen cites to only one paragraph in the TAC when arguing materiality: he alleges that "[t]he Medicare Manual indicates that Medicare denies claims if an assignment is not available upon request." (Pl.'s Mot., at 14 (citing TAC ¶ 139 (citing *Centers for Medicare & Medicaid Services, Jurisdiction B DME MAC Supplier Manual*, Chapter 12: Claim Submission, at 4 (Dec. 2010)).) Olhausen believes this distinguishes his case from *Universal Health Services* because there, "the Supreme Court explained that materiality is not met merely because the Government has the option to decline to pay." *Id.* (citing *Univ. Health Servs.*, 579 U.S. at 194.) Here, in contrast, "CMS makes the affirmative statement that it will not pay if an assignment is not provided upon request and will instead seek overpayments from the supplier." *Id.*

But the Supreme Court in *Universal Health Services* went a step further, explaining that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Univ. Health Servs.*, 579 U.S. at 194. Yet that is exactly what Olhausen seeks this Court to conclude: that because the Manual says that Medicare "denies claims if an assignment is not available," or in other words, that an assignment is a condition for payment, then the lack of an assignment is necessarily material. (Pl.'s Mot., at 14.) Without additional relevant allegations, *Universal Health Services* forecloses Olhausen's route to materiality.

In *Universal Health Services*, the Supreme Court outlined the various factors a plaintiff must show to demonstrate materiality. *See Univ. Health Servs.*, 579 U.S. at 194-95. Moreover, the Supreme Court made clear that a plaintiff must plead facts, *with particularity*, relevant to these factors. *See id.* at 195 n.6 ("The standard for materiality that we have outlined is a familiar and rigorous one. And False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality.").

Olhausen does not come close to meeting those pleading standards. Take paragraph 139 of the TAC, which cites the CMS manual Olhausen relies upon to establish materiality. Olhausen only paraphrases the document; he neither quotes it nor attaches it as an exhibit. Though the Court must take all facts as true and make all inferences in favor of Olhausen, the allegation in paragraph 139 is vague, generalized and therefore unparticular. *See United States ex. rel. Askari v. PharMerica Corp.* 2024 WL 1132191, at *3 (2d Cir. March 15, 2024) (finding the plaintiff did not adequately plead materiality where "the CMS Medicare Fraud Handbook's general discussions of fraudulent billing do not establish with particularity that the government would have refused to reimburse Defendants' claims if it had been aware of their dispensing arrangements").

Because Olhausen fails to plead materiality, his FCA claim based on failure to collect assignments fails.

### D. Scienter

Had Olhausen pled materiality, he still had to plead scienter. The Defendants believe that "Olhausen [fails] to carry his heavy burden of showing that Arriva was subjectively reckless, much less knowing, in allegedly flouting the law" when it allegedly failed to collect assignments. (Defs.' Mot., at 12.)

Under the FCA, a defendant is only liable when it "knowingly" makes a false statement or claim to the Government. *Olhausen*, 124 F.4th at 856 (citations omitted). In *Schutte*, the Supreme Court clarified that "knowingly," "refers to [a person's] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Schutte*, 598 U.S. at 749. In *Schutte*, the Court concluded that in that case, the petitioners could establish scienter:

> by showing that respondents (1) actually knew that their reported prices were not their "usual and customary" prices when they reported those prices, (2) were aware of a substantial risk that their higher, retail prices were not their "usual and customary" prices and intentionally avoided learning whether their reports were accurate, or (3) were aware of such a substantial and unjustifiable risk but submitted the claims anyway.

*Id.* (citing § 3729(b)(1)(A)).

In arguing that he adequately pleads scienter, Olhausen points out that he:

> [T]old Arriva's managers that they were required to obtain AoBs, *id.* ¶ 126, that Arriva's management knew Defendants were required to obtain AoBs, *id.* ¶¶ 123, 132–33, that Arriva considered fixing the problem by obtaining AoBs, *id.* ¶ 127, but that Defendants ultimately decided to take an unjustifiable risk and not collect the AoBs because obtaining AoBs would 'make calls lengthier and [Arriva's] sales representatives would lose commission money,' *id.* ¶ 128.

(Pl.'s Resp., at 12-13 (quoting TAC ¶ 128.) The Defendants believe that such allegations are inadequate because "a company does not cross the line from negligence to recklessness by disagreeing with an employee's views" as to statutory requirements and that Olhausen "does not address any of the 'benign alternative explanations' for Arriva's collection of assignments identified in the motion to dismiss." (Defs.' Reply, at 9-10.)

The issue with the Defendants' argument is that, as Olhausen points out, the TAC does not allege "that Arriva believed it had a different regulatory interpretation" of its requirements to collect assignments of benefits. (*See* Pl.'s Resp., at 16.) Thus, the Defendants' arguments that Arriva considered Olhausen's interpretation of its statutory requirements but simply disagreed with it—though relevant to the issue of scienter—is more appropriate for a motion for summary judgment or at trial, *not* on a motion to dismiss.

It may very well be the case that Arriva considered Olhausen's view and simply disagreed with it. Or it could be the case that Arriva agreed with Olhausen's view, decided to ignore it, and then came up with its reasonable interpretation—though incorrect—of its statutory requirements. But "[b]oth the text [of the FCA] and the common law also point to what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it . . . As such, the focus is not . . . on *post hoc* interpretations that might have rendered their claims accurate." *Schutte*, 598 U.S. at 752.

Here, Olhausen alleges that Arriva "knew [assignments of benefits] were required and had an official policy to obtain [assignment of benefits] from its beneficiaries through the Customer Account Form," but that "Arriva instructed its employees not toi discuss the AoBsunless it was brought up by the beneficiary." (TAC ¶¶ 123-24.) Olhausen then advised Arriva that it should obtain assignments, that Arriva considered that request, but declined to do so because "the addition would make calls lengthier and her sales representatives would lose commission money." (*Id.* ¶¶ 125-28.)

One benign explanation of this conduct, as the Defendants note, is that the Defendants genuinely thought collecting assignments were not required and, moreover, did not make sense from a business perspective. (Defs.' Reply, at 13-14.) However, at the motion-to-dismiss stage, the Court must make all inferences in favor of Olhausen. Doing so, the Court finds that one other plausible explanation is that Arriva knew or thought that it was required to collect assignments, but decided it was worth the risk not to in order to save money. Such an explanation satisfies *Schutte* and, therefore, Olhausen adequately pleads scienter. *See Schutte*, 598 U.S. at 743 ("What matters for an FCA case is whether the defendant knew the claim was false.").

### E. Leave to Amend

In his response to the motion to dismiss, Olhausen requests that the Court allow him to amend should it dismiss his complaint. (Resp., at 20-21.) However, this would be Olhausen's fourth time amending his complaint, and the Court has already explained that the deadline to amend pleadings has passed and that Olhausen "chose to stand on his pleadings rather than seeking timely leave to amend." (Order Denying Mot. for Leave to Amend, ECF No. 99 at 1.) In other words, this Court noted that Olhausen "will not be afforded yet another bite of the apple where he declined 'to follow the well-trodden procedural path toward amendment.'" (*Id.* at 2 (quoting *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 930 (11th Cir. 2016)). Moreover, Olhausen's request to allow him to amend is bare and does

not explain "why justice might require a [fourth] opportunity to amend." *Id.* Olhausen's complaint is therefore **dismissed with prejudice**. *See id.* (upholding dismissal with prejudice where represented party had previous opportunity to amend; was "offered ample opportunity to state a claim on which relief could be granted;" and "never squarely pursued its right to seek leave to amend under Rule 15(a)(2) when Defendant again moved to dismiss").

### IV.  Conclusion

For the reasons explained above, the Court **grants** the Defendants' motion to dismiss (**ECF No. 109**) **with prejudice**.

The Clerk of Court is directed to **close** this case. Any pending motions are **denied as moot**.

**Done and ordered** in Miami, Florida, on June 10, 2025.

_____
Robert N. Scola, Jr.
United States District Judge